Michael BERGREN, individually and by his guardians, Kenneth Bergren and Adriane Bergren, Plaintiffs-Appellants,

v.

CITY OF MILWAUKEE, et al., Defendants-Appellees.

No. 85–2380.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 3, 1986.

Decided Feb. 11, 1987.

Robert E. Sutton, Sutton & Kelly, Milwaukee, Wis., for plaintiffs-appellants.

Reynold Scott Ritter, Milwaukee City Attorney's Office, Milwaukee, Wis., for defendants-appellees.

Before CUDAHY, EASTERBROOK, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Michael Bergren and his guardians, Mr. and Mrs. Bergren,[1] filed suit under 42 U.S.C. § 1983 against the City of Milwaukee and several of its police officers. The Bergrens claim that the appellees violated their constitutional rights by arresting Michael Bergren without probable cause, separating him from his stepmother and retaining custody over him for approximately ten hours. The district court granted the appellees' motion for a directed verdict on the ground that the appellants failed to establish that the appellees acted in violation of the Constitution. We affirm.

I

A. *Factual Background*

On the night of September 15, 1982, eleven-year old Michael Bergren was babysitting two-year old Kelly Tompkins while his mother accompanied Kelly's mother to a party. At approximately 12:30 a.m. on September 16, Mr. Tompkins arrived at his home. The mothers had not yet returned from the party. Upon looking in on his daughter, Mr. Tompkins discovered that her face was bruised, that she had vomited and that she was unresponsive. As Mr. Tompkins rushed out of the house carrying Kelly, he remarked that Kelly looked as if she had been beaten. Michael remained at the Tompkins' residence for about thirty minutes and then walked home.

Mr. Tompkins notified his wife and Mrs. Bergren of Kelly's condition and they both immediately joined him at the hospital where he had taken Kelly. Doctors at the hospital notified the police that Kelly was in critical condition with a fractured skull. When Mrs. Bergren overheard the officers discussing the possibility of charging Michael with either child abuse or attempted murder, she told the police officers that he was her son and, at the request of the officers, she brought him to the hospital.

At approximately 2:00–2:30 a.m., two police officers took Michael into custody at the hospital. They then transported him to the police station in downtown Milwaukee. The officers refused Mrs. Bergren permission to accompany them in the police car, and refused to wait for her to arrange transportation so that she could follow the squad car to the station. The officers told Mrs. Bergren that Michael would be taken either to the First District Station or to the Children's Center, but they were uncertain where he ultimately would be detained.

Two detectives questioned Michael Bergren at the station for approximately forty-five minutes. The detectives informed Michael of his right to counsel, which, according to their testimony, he waived. He told the detectives that he had pushed Kelly down because she would not stop crying and, as a result, Kelly hit her head on the kitchen table and cut her lip. Michael also told the detectives that he had slapped Kelly after she had bitten him. When the detectives had finished questioning Michael, he was placed in a cell in the "segregated juvenile section of the city lockup" where he remained until 6:20 a.m. Michael spent approximately fifty-four minutes in

---

1. While the draftsmanship exhibited in this complaint leaves much to be desired, it appears that Mr. and Mrs. Bergren brought this action not only in their son's name for the deprivation of his rights but also on their own behalf for the deprivation of their own rights.

the cell. He was then handcuffed and taken to the juvenile detention center.

Despite numerous phone calls to the police station to find out where her son was being held, Mrs. Bergren testified that she was not told where her son had been taken until 4:40 a.m. after she had threatened to call the newspaper. She was then told that Michael had admitted "everything," that he was being charged, and that a hearing would be held in the morning. However, a police report indicated that Officer John Thiel had notified one of Michael's parents at 2:45 a.m. that Michael was detained at the station.

According to Michael's testimony, the police officers failed to tell him where he was being taken or what was going to happen to him. Michael testified that he was scared during the questioning and that he lied to the officers, telling them what he thought they wanted to hear. He further stated that he did not fully understand the *Miranda* warnings, although, during the questioning, he gave no indication to the officers that he did not understand his rights. Michael asked if he could use the bathroom and was allowed to do so. According to Michael's description, the cell in the station was dark and filthy and the water fountain and toilet were not functioning. Michael repeatedly asked for his stepmother and was told that she was not allowed to be with him at the station. Michael testified that he was crying and yelling, but a police officer told him to "shut up." He was unable to sleep in the cell, but he slept in the squad car while he was transported to the juvenile detention center. An intake worker at the juvenile center interviewed Michael and he was released from the center at approximately noon on September 16.

### B. Allegations of the Complaint

The complaint alleged that the appellees violated appellants' fourth, fifth, sixth, eighth, and fourteenth amendment rights as well as rights guaranteed by section 895.46 of the Wisconsin statutes. R.1 at 1. The appellants alleged that the police offi-

cers arrested Michael without probable cause and that his confinement in the cell at the police station constituted cruel and unusual punishment and deprived Michael of his due process and equal protection rights. Further, the appellants claim that, by refusing to allow Mrs. Bergren to accompany Michael to the station, the police officers violated the right of association between parent and child protected by the due process clause. In addition, the appellants' complaint alleged pendent state claims for emotional distress suffered by Michael and Mrs. Bergren resulting from the officers' conduct.

### C. The District Court's Decision

Ruling on defendants' motion for a directed verdict, the district court addressed four issues: whether the defendants' conduct constituted a violation of 1) the fourteenth amendment's due process clause, 2) the fourth amendment's prohibition against unreasonable searches and seizures, 3) the right of familial association derived from the fourteenth amendment, and 4) provisions of chapter 48 of the Wisconsin statutes regulating the taking of children into custody. The district court concluded that the plaintiffs failed to establish a prima facie case that the defendants acted in violation of the Constitution because the officers had probable cause to arrest and detain Michael and the plaintiffs presented no evidence of mistreatment, abuse or unlawful conduct by the officers toward Michael. Further, the district judge held that the defendants did not violate Wisconsin's statutory standards for taking children into custody because the officers reasonably concluded that Michael posed a substantial risk of physical harm to other persons or to himself and this threat justified placing him in a secured detention facility.

### II

### A. The Standard of Review

"The standard for granting a directed verdict is very generous to the nonmovant. The trial court must view the evidence and make all inferences in the light most favor-

able to the nonmoving party, and if reasonable jurors could differ on the conclusions drawn therefrom, the case must go to the jury." *Benson v. Allphin*, 786 F.2d 268, 279 (7th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986). To bring a successful section 1983 claim, the plaintiffs must prove that the defendants deprived them of a right secured by federal law or the Constitution while acting under color of state law. *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1339 n. 1 (7th Cir.1985); *Beard v. Mitchell*, 604 F.2d 485, 495 & n. 12 (7th Cir.1979). In addition, to hold the city liable, the plaintiffs must establish that the defendants acted pursuant to governmental policy, custom, or regulation. *Monell v. Department of Social Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978).

## B. *Probable Cause to Arrest*

■ The appellants first contend that the officers violated Michael's fourth amendment rights by taking him into custody. To succeed on this claim, however, the appellants must demonstrate that the police officers lacked probable cause to take Michael Bergren into custody. Probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). "The police have probable cause to arrest an individual where 'the facts and circumstances within their knowledge and of which they [have] reasonable trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense.'" *United States v. Goudy*, 792 F.2d 664, 668 (7th Cir.1986) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)). "The determination of whether probable cause exists in a given situation involves 'the factual, practical considerations of everyday life upon which reason-

able, prudent [persons], not legal technicians act.'" *Id.* (quoting *United States v. Watson*, 587 F.2d 365, 368 (7th Cir.1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979)).

In this case, clearly there was probable cause for the police officers to take Michael into custody. The officers knew that Kelly Tompkins had been in Michael's exclusive control and that Kelly had suffered serious injuries, including a fractured skull. This information provided reasonable grounds for the police officers to believe that Michael had violated Wisconsin's child abuse laws. The existence of probable cause to arrest Michael bars appellants' section 1983 claim. *See Williams v. Kobel*, 789 F.2d 463, 470 (7th Cir.1986) (proof of probable cause to arrest is an absolute bar to a section 1983 action).

## C. *The Conditions and Duration of the Confinement*

The appellants further contend that the police officers violated Michael Bergren's eighth and fourteenth amendment rights by questioning him for forty-five minutes in the early hours of the morning without the presence of counsel or a parent, locking him in a filthy cell for almost an hour and keeping him in their custody for approximately ten hours.

■ The existence of probable cause to arrest Michael justified the officers' decision to detain him at the police station. "[A] policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest." *Gerstein v. Pugh*, 420 U.S. 103, 113–14, 95 S.Ct. 854, 862–63, 43 L.Ed.2d 54 (1975). We must now assess whether the conditions and the duration of the confinement violated Michael's due process rights.[2]

---

2. Although the appellants' complaint alleges that the conditions of the pre-trial detention deprived Michael Bergren of liberty without due process of law and constituted cruel and un-

usual punishment, their allegation implicates Michael's due process rights rather than his eighth amendment rights. "[U]nder the Due Process Clause, a detainee may not be punished

■ The right to arrest a suspect does not, of course, give the state the right to hold him for any length of time or under any conditions. "It is axiomatic that [d]ue process requires that a pretrial detainee not be punished." *Schall v. Martin,* 467 U.S. 253, 269, 104 S.Ct. 2403, 2412, 81 L.Ed.2d 207 (1984) (citing *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1871 n. 16, 60 L.Ed.2d 447 (1979)). Moreover, both the length and the conditions ·of the pre-trial confinement must serve legitimate regulatory purposes of the state. *Id.* (citing *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963)).

A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an express intent to punish on the part of the State, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it.]"

*Id.* In assessing whether the length of pre-trial confinement violates the due process clause, this court has required an explanation in the record for the detention of adults arrested for a non-violent misdemeanor charge for four hours. *See*

*Gramenos v. Jewel Cos.,* 797 F.2d 432, 437 (7th Cir.1986); *see also Moore,* 754 F.2d at 1350–51 (remanding case to determine why defendants arrested for a minor misdemeanor were held in jail for four hours).

Pre-trial detention of a juvenile does not violate the due process clause provided that: 1) the state does not subject a juvenile to restrictions and conditions of confinement amounting to punishment and 2) the period of detention is not excessive in relation to the state's interest in protecting both the community and the juvenile from the consequences of future criminal conduct. *Schall,* 467 U.S. at 269, 104 S.Ct. at 2412.

In assessing whether the treatment of the detained juvenile satisfies the requirements of due process, it is quite appropriate—indeed necessary—to consider that in such an environment juveniles may indeed have different needs and more importantly, different capacities than adults.[3] For the juvenile, the experience of incarceration may have a far more long-lasting psychological effect.[4] As the Supreme Court has noted, minority "is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982). The possibility of such serious injury at the hands of the state to a presumptively inno-

---

prior to an adjudication of guilt in accordance with due process of law." *Moore v. Marketplace Restaurant,* 754 F.2d 1336, 1350 n. 21 (7th Cir. 1985). "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Ingraham v. Wright,* 430 U.S. 651, 671–72 n. 40, 97 S.Ct. 1401, 1412–13 n. 40, 51 L.Ed.2d 711 (1977).

**3.** As the Supreme Court recognized when assessing the voluntariness of a confession, a reviewing court must consider the different capacities of a juvenile.

[W]hen ... a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy.... He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is

the period of great instability which the crisis of adolescence produces. A 15–year–old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition. Mature men might stand the ordeal from midnight to 5 a.m. But we cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him.

*Haley v. Ohio,* 332 U.S. 596, 599–600, 68 S.Ct. 302, 303–04, 92 L.Ed. 224 (1948) (quoted in *Woods v. Clusen,* 794 F.2d 293, 297 n. 5· (7th Cir.1986)).

**4.** *See Schall v. Martin,* 467 U.S. 253, 291, 104 S.Ct. 2403, 2424, 81 L.Ed.2d 207 (1984) (Marshall, J., dissenting).

cent minor must be taken into consideration when assessing the conditions of confinement.

■ In this case, Michael Bergren's due process rights were not violated because he was not punished nor, under the circumstances presented here, was he confined for an excessive amount of time. We do not find the record deficient in explaining why he was in the officers' custody for such a lengthy period. In contrast to the defendants in *Gramenos* and *Moore,* the officers believed that Michael had committed a violent crime and believed he might pose a danger to himself. As a juvenile, Michael's liberty interest may, "in appropriate circumstances, be subordinated to the State's *'parens patriae* interest in preserving and promoting the welfare of the child.'" *Schall,* 467 U.S. at 265, 104 S.Ct. at 2410 (quoting *Santosky v. Kramer,* 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599 (1982)). The record indicates that the officers questioned Michael for approximately forty-five minutes, detained him for less than an hour in a cell segregated from the adult cells and, at the earliest practical opportunity, transported him to a juvenile center where he was interviewed by an intake worker, the initial step mandated by state law for the processing of juvenile offenders.[5] As the district court found, the record reveals no excessive physical or psychological abuse and the duration of confinement was not, under the circumstances presented here, excessive.

The district court correctly held that the defendants' conduct did not violate Michael Bergren's fourteenth amendment rights. We stress that, in holding that the actions of the police officers in this case did not violate the minimum standards imposed by the federal constitution, we do not express in any way our approval of the methodology employed by the officers in this case. We simply hold that, under these circumstances, there was no violation of the federal constitution.

### D. *The Right of Association*

■ The appellants further contend that the appellees violated their rights to the "continuing association, support and succor which is derived from the family relationship" protected by the first and fourteenth amendments. Appellants' Br. at 4. There can be no question that the "integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment." *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972); *see generally Moore v. City of E. Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977) (opinion of Powell, J.) ("Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition."). The interruption of this familial tie—even temporarily—can occur "only with rigorous protections for the individual liberty interests at stake." *Bell v. City of Milwaukee,* 746 F.2d 1205, 1243–44 (7th Cir.1984).

A parent's right to the custody of his minor child is constitutionally protected. *Ellis v. Hamilton,* 669 F.2d 510, 512 (7th Cir.1982). However, as we have already discussed, the state may take a minor into custody when it has probable cause to believe the minor has committed a crime. *Gerstein,* 420 U.S. at 113–14, 95 S.Ct. at 862–63. Moreover, acting in its role as *parens patriae,* it may interfere with the parent-child relationship to detain a juvenile prior to trial to protect both the juvenile and society from the risk of pre-trial crime. *Schall,* 467 U.S. at 265, 104 S.Ct. at 2410. On this record, we believe that the district court correctly concluded that the arrest and relatively short detention of Michael Bergren did not violate his associational rights or those of his parents.[6]

**5.** Because Michael Bergren was released by the juvenile intake officer, this case does not require that we review the constitutionality of the procedures set forth in the Wisconsin statutes for detaining a juvenile beyond the short period necessary for initial processing.

**6.** We emphasize that our holding is limited to the circumstances of this case. There certainly

After reviewing the evidence in the light most favorable to the appellants, we conclude that they have failed to establish a deprivation of constitutional rights. We therefore conclude that the district judge properly granted the defendants' motion for a directed verdict. Accordingly, we affirm the district court's judgment.

AFFIRMED.

are situations in which denial of the presence of the parent or of communication between a parent and a child, especially one of tender years, might have grave constitutional implications. *See generally In re Gault,* 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527 (1967); *United States v. White Bear,* 668 F.2d 409, 412–13 (8th Cir. 1982) (access to parental advice is one factor to consider in determining whether a youth has validly waived constitutional rights).