Alice CHATHAS and Byron Ellis,
Plaintiffs–Appellants,

v.

Norbert SMITH, Individually and as
Chief of Police of Village of Evergreen
Park, et al., Defendants–Appellees.

No. 87–2821.

United States Court of Appeals,
Seventh Circuit.

Argued April 13, 1988.

Decided Sept. 5, 1989.

See also, 848 F.2d 93.

Leonard Ring, Leslie J. Rosen, Ring & Associates, Chicago, Ill., for plaintiffs-appellants.

Iris E. Sholder, Richard M. Daley, State's Atty., Office of the State's Atty. of Cook County, Lynn D. Dowd, D. Kendall Griffith, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Robert M. Chemers, Robert J. Franco, Pretzel & Stouffer, Michael G. Burton, Julian C. Campbell, Jr., Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., John Walsh, State Bar of Wisconsin, Madison, Wis., for defendants-appellees, Norbert Smith.

Before MANION and KANNE,
Circuit Judges, and FAIRCHILD,
Senior Circuit Judge.

MANION, Circuit Judge.

Plaintiff-appellant Byron Ellis, a former police officer with the Village of Evergreen Park, assisted by his lawyer, plaintiff-appellant Alice Chathas, sued the Village and various responsible officials to secure increased pension benefits. On the day the trial was supposed to begin, the various defendants—deputy sheriffs, Village officers, and the lawyer representing the Village—attempted to involuntarily commit Ellis to a mental institution. The mental hospital found that Ellis did not meet its admission standards. Later he won the pension benefits he originally sought. Ellis

and Chathas subsequently sued the various defendants under 42 U.S.C. § 1983 to redress alleged deprivations of their rights under the Fourth and Fourteenth Amendments.

After plaintiffs presented their evidence to a jury, the district court granted defendants' motion for a directed verdict. Plaintiffs appealed. Because we agree with the district court that the plaintiffs did not present evidence sufficient to show any deprivation of any constitutional right, we affirm.

## I. NATURE OF THE CASE [1]

In 1968, plaintiff-appellant Byron Ellis joined the Village of Evergreen Park Police Department (Police Department) in Evergreen, Illinois, as a police officer. For ten years, Ellis performed his duties quietly. In 1978, however, Ellis accidentally shot his niece at his home. On December 11, 1978, Sergeant Klomhaus of the Police Department received a call from the former Mrs. Ellis that—in the words of the sergeant's contemporaneous internal report—her husband was in a "highly nervous state," as evidenced by the fact that he "had been sitting on the couch in the living room with his silver gun by his side." Mrs. Ellis stated she feared that her husband would kill himself. By the time Klomhaus and two other officers arrived at his house, Ellis had gone to the basement. According to his memorandum, Klomhaus "spoke to Detective Ellis from the head of the stairs and received the reply that if we or anyone came down and set a foot on the stairs he would blow us away."

Less than a year later, Ellis learned that—contrary to what he had assumed—the Police Department had not enrolled him in the Illinois Municipal Retirement Fund (the Fund). To assist him in becoming enrolled, Ellis retained plaintiff-appellant Alice Chathas to represent him. In November, 1979, Ellis sued, in Illinois state court, the Fund, a local agent for the Fund,

the Board of Trustees of the Village of Evergreen Park, and Carl Bergman, who was an Evergreen police officer and the Fund's secretary. The Village hired Vincent Cainkar, a private attorney in civil practice, to represent it in the pension case. The parties have stipulated in the pretrial order in this action that "Cainkar was an attorney for the Village of Evergreen Park."

Ultimately, the pension case was set for a hearing on pending pretrial motions and for possible trial on Monday, March 30, 1981. Circuit Court Judge Joseph Salerno would preside in the Worth Township Courthouse in Alsip, Illinois. By this time, Ellis was no longer working and had already been declared eligible for disability and pension benefits from the Fund (thus narrowing the issues for trial to when he became eligible for those benefits). On March 12, 1980, while on duty, Ellis had admitted himself to a hospital emergency room for tests. Ellis stated to hospital personnel that he was working without any disability benefits and felt increasingly worried. The hospital referred Ellis to Dr. Sokhey, a psychiatrist. Dr. Sokhey recommended that Ellis remain off work until the pension case was resolved. Ellis saw Dr. Sokhey for more than four months. Ellis followed Dr. Sokhey's advice and did not return to the Police Department. In response to an inquiry by Police Chief Norbert Smith, Chathas stated that Ellis was absent and undergoing treatment because he was "under significant physical and emotional strain and apprehension." Subsequently, Ellis filed a claim for worker's compensation in which he claimed anxiety, neurosis, and depression as his injuries.

To verify Ellis's claim that he was mentally disabled, the Fund had requested that Dr. Ramesh Doshi, a psychiatrist, examine Ellis. Dr. Doshi examined Ellis on March 19, 1981. As Doshi testified, Ellis told him that he was depressed, was not sleeping, and was experiencing distress. Ellis also told Doshi that he felt that Village officials

---

**1.** In evaluating a motion for a directed verdict this court must, as must a trial court, view the evidence and make all inferences in the light most favorable to the nonmoving party. If rea-

sonable jurors could differ as to the conclusions to be drawn from the evidence, the jury must hear the case. *See, e.g., Bergren v. City of Milwaukee,* 811 F.2d 1139, 1141–42 (7th Cir.1987).

and Police Department officers were conspiring against him because of the pension litigation. As part of this conspiracy, Ellis believed that those people were threatening his life and his attorney's life. According to Doshi, Ellis told him that "[h]is attorney's life had been threatened, I guess the brake lines were cut; his windows were broken ...; he also felt that his life was jeopardized by the department." Ellis told Doshi that he felt threatened by what he was experiencing and that "[i]f I felt mistreated or if I felt cornered, I may blow somebody away." Ellis confirmed the essential details of his visit to Doshi; Ellis testified that he told Doshi that "[i]f someone was to make and be a threat to my life that I would take the appropriate amount of action to terminate the situation even if the action meant taking their life, to kill them."

Dr. Doshi concluded that Ellis was paranoid and depressed and that Ellis's "insight and judgment are grossly impaired due to delusional state." Because Dr. Doshi was concerned about the threats that Ellis had made regarding Village officials and Police Department officers, Doshi decided to examine Ellis for a second time on Saturday, March 21, 1981. After that examination, Doshi recommended to Ellis that he voluntarily admit himself to a mental hospital. Ellis refused. Dr. Doshi then advised Ellis that he felt obligated to let Ellis's potential victims know about Ellis's threats. Subsequently, Doshi telephoned Chathas to ask her to convince Ellis to enter a mental hospital. Doshi at that time told Chathas he would inform Ellis's potential victims about Ellis's threats.

Sometime that afternoon, Doshi called the Police Department because he believed there was a "serious potential for serious harm to one or more people anticipating the court date coming up for the pension decision." His call was referred to Sergeant Klomhaus. Dr. Doshi relayed to Klomhaus what Ellis had said and told Klomhaus that although Ellis was not immediately dangerous, he did have a potential for violence. In this regard, Doshi told Klomhaus that the upcoming March 30 court date could trigger that violence. Doshi warned Klomhaus that Ellis should not possess any weapons.

Later, Klomhaus wrote a memorandum to Chief Smith describing his telephone call with Doshi. That memorandum from Sergeant Klomhaus provided in pertinent part as follows:

> The doctor is advising the police because of the potential for homicide that he feels Byron Ellis exhibits, Officer Ellis commented words to the effect that if those were all conspiring against him don't back off he's going to blow them away.... The doctor feels that Byron is in need of immediate hospitalization, and with the attorney attempted to talk to Byron into going into the hospital. Byron refused.

> The doctor described Byron as a time bomb who, although appears to be stable now, can go off at any time.... The doctor further feels that the next court date on his suit ... could be the critical point, especially if the decision is against Byron.... The doctor further related that in order to commit someone such as Byron a petition must be signed, and anyone can sign it. This, with two doctors' statements that a person is in need of psychiatric help, will allow a judge to sign commitment papers.

> The doctor advised that the reason for the call is because he feels that there is great potential for something bad to happen and he feels bound by law to report it.

Chief Smith received this memorandum setting forth Dr. Doshi's warnings on Monday morning, March 23. In addition, Chief Smith knew that Ellis had approximately fourteen guns in his home, that he made his own bullets, and that he kept gunpowder at home. Smith also knew that Ellis was a sharpshooter. Given these facts, as Lieutenant Bergman would later testify, the Police Department wanted to avoid a confrontation with Ellis at his home, where he would have access to that arsenal.

Chief Smith called attorney Cainkar for guidance. Cainkar responded to Chief Smith on Friday afternoon. He told Chief

Smith that he had spoken with Judge Eiserman, the Fifth District's presiding judge, and that Judge Eiserman had ordered additional security for the courthouse on March 30. On that Friday, Judge Eiserman had asked defendant James Ross, a Cook County deputy sheriff, to make sure that the sheriff's office provide extra security for the courthouse by setting up a desk and metal scanners at the entrance to the courthouse. In addition, Judge Eiserman ordered that everybody who entered the courthouse would be subject to a full search to ensure that no one would be armed.

Later that afternoon, Cainkar called Smith again and asked him to have Doshi fill out a certificate for Ellis' involuntary admission to a psychiatric hospital. Smith in turn instructed Klomhaus to get in touch with Doshi. Klomhaus contacted Doshi and told him that the legal department of the Village had asked him to sign a certificate for involuntary hospitalization.

The next day, Saturday, March 28, Klomhaus brought the certificate to Doshi. Doshi completed the certificate, indicating that he had examined Ellis on March 19. Dr. Doshi concluded with the following: "If patient feels under distress or if he loses control, situation could prove dangerous to others and even himself."

On Monday, March 30, Deputy Sheriff Ross arrived early at the courthouse, where he met defendant Vince Ruffalo, another deputy sheriff. Ross ordered Ruffalo to lock all the doors except the front one and to set up a desk at the front door. Ross told Ruffalo that their job was to see if any problem developed with Ellis and to report back to Judge Eiserman. Cainkar arrived next and instead informed Ross that there would be no trial. Instead, police officers would soon arrive to take Ellis to the Tinley Park Mental Health Center for "an involuntary admission for evaluation."

Next, Chief Smith arrived along with officers Evoy and Bergman. The sheriff's deputies asked them to remove the bullets from their guns, which they did. Afterwards, the three police officers met with Cainkar and Deputies Ross and Ruffalo. Ross and Cainkar told the officers that Judge Salerno, the presiding judge, did not want Ellis in his courtroom. The group decided to stop Ellis once he entered the building and to take him into custody for this psychiatric evaluation. The police officers then stood off to the side.

After chatting with the police officers, Cainkar, armed with Dr. Doshi's certificate, went to Judge Salerno's chambers and asked him to sign papers to involuntarily commit Ellis. Judge Salerno refused.

Subsequently, at around 11:40 a.m., Chathas and Ellis arrived. Chathas walked through the initial search station set up by the sheriff's deputies. There, DiCarlo and another deputy sheriff operated a hand-held metal scanner which scanned Chathas as she walked through. According to Chathas' testimony, she told the deputies that she was going to the courtroom. DiCarlo stopped her. He and the other deputy sheriff physically lifted her off the ground, carried her twenty feet across the rotunda, deposited her inside a jury room, and shut the door. A female deputy sheriff, Angeline Chmielewski, waited in the jury room. She searched Chathas' purse and frisked her.

After walking through the metal scanning, Ellis started towards the courtroom. Smith and Evoy called out to Ellis. Ellis ignored them. Smith, Evoy and Bergman then ran towards him and grabbed him. They started pushing and jostling him. At this point, according to Ellis, Deputy Sheriff Ross screamed, "Don't let him in the courtroom." Ross then tackled Ellis around the waist and pulled him back. Someone else was punching Ellis on his lower back. Chathas testified that she opened the door to the jury room and saw Smith, Evoy, and Bergman trying to force Ellis into the jury room. When Chathas emerged from the jury room and saw the police officers dragging Ellis across the hall, she told Smith to let go of her client. She testified that Smith responded, "Go f—— yourself." Smith, Evoy, and Bergman maneuvered Ellis across the rotunda of the courthouse into the jury room.

The police officers entered the jury room with Ellis. Sheriff's deputies were already present. Chathas testified that she advised Cainkar, who was in the room directing the others, that they were there for a trial. Cainkar allegedly replied, "I'm not doing any jury trial today. He's going ... to Tinley Park." Cainkar advised Chathas that he was authorized to take Ellis to Tinley Park by § 3–606 of the Illinois Mental Health Code, which provides in pertinent part as follows:

A peace officer may take a person into custody and transport him to a mental health facility when, as a result of his personal observation, the peace officer has reasonable grounds to believe that the person is subject to involuntary admission and in need of immediate hospitalization to protect such person or others from physical harm. Upon arrival at the facility, the peace officer shall complete the petition under Section 3–601.

Cainkar ordered that Ellis not be let out of the room. Evoy and Bergman closely guarded Ellis. Ellis remained in the jury room for at least thirty minutes.

Chathas testified that in addition to restraining Ellis, the police officers and deputy sheriffs also restrained her. In particular, Chathas testified that Lt. Evoy and Deputy Sheriff Ross blocked the door to the jury room. But Chathas admitted upon cross-examination that she was able to leave the jury room when she wished. In fact, she left to obtain a copy of the Illinois Revised Statutes to check Cainkar's authority to commit a person involuntarily for psychiatric evaluation. Chathas further admitted that nobody touched her after the sheriff's deputies brought her to the jury room. Chief Smith, for example, did not physically hinder her; his only sin was that, according to Chathas, "I needed to speak with my client and he would not cooperate in permitting me some privacy to maintain the integrity of the attorney-client relationship."

Chathas walked to a law library in the courthouse and returned with a copy of the Mental Health Code. After reading § 3–606 she told Cainkar that the statute did not apply. According to Chathas, Cainkar replied that he did not care; Ellis was going to the hospital even though there was no court order forcing him to go. When Chathas warned him that he was violating Ellis' civil rights, Cainkar allegedly responded, "So what. I don't care. He's going." When Chathas repeated that he was breaking the law, Cainkar reportedly responded, "I don't give a damn about the law. He's going. Take him away." When Chathas again repeated that he was violating Ellis' civil rights, Cainkar emphatically retorted, "He has no rights; he has no rights. He's going."

Ultimately, an Alsip police officer and two paramedics from the Alsip Fire Department arrived. An Evergreen Park police officer told one of the paramedics that they would find in the jury room "an emotionally disturbed patient ... who was known to be armed and could possibly be dangerous." Ellis was sitting peacefully on a chair in the jury room; indeed, the paramedics initially walked toward Chief Smith. The paramedics convinced Ellis to accompany them to the Tinley Park Mental Health Center. Chathas voluntarily accompanied Ellis and the paramedics.

When they arrived at Tinley Park, Donald Warmack, a Mental Health Specialist II working in the admissions department, asked the paramedics if they had any paperwork to admit Ellis. They did not. Shortly afterwards, Klomhaus and either Bergman or Evoy (there is a dispute in the record about that) arrived and presented Warmack with the certificate signed by Doshi. Warmack believed the certificate to be invalid because the certifying physician had not examined the patient within the previous 72 hours. Warmack returned the certificate. When Warmack asked the officers if they had personally observed any behavior upon which a petition could be based to indicate that Ellis was a danger to himself or to others, Klomhaus responded that they had not. After speaking with Ellis and Chathas, Warmack saw no reason to hold Ellis for evaluation at Tinley Park and allowed him to leave. Ellis had been at Tinley Park for approximately 45 minutes.

While it is unclear when he returned to the courthouse, he ultimately won the pension litigation.

## II. NATURE OF THE PROCEEDINGS

On July 13, 1981, Ellis and Chathas brought this action pursuant to 42 U.S.C. § 1983. Plaintiffs sought damages for the alleged deprivation of their Fourth, Sixth, and Fourteenth Amendment rights.[2]

Several years later, on May 5, 1987, the district court directed a verdict in favor of all defendants after plaintiffs had closed their case. The court held that defendants did not violate the plaintiffs' constitutional rights and that, in any event, defendants were entitled to qualified immunity because there was no evidence to suggest that defendants did not believe in good faith that their actions were constitutional.

Given the multiplicity of plaintiffs and defendants, we now set forth how the district court viewed the causes of action by first Chathas and then Ellis against each set of defendants with differing factual or legal issues.

*Chathas v. DiCarlo:* The trial court credited Chathas' testimony that DiCarlo and another deputy lifted her off her feet and either dragged or carried her to the room across the rotunda in which Chmielewski waited, but held that "[t]his would go not to a Fourth Amendment claim, but to an excessive force claim." The court then expressly relied on the standards for excessive force as set forth in *Gumz v. Morrissette,* 772 F.2d 1395 (7th Cir.1985) to reject Chathas' claim.

*Chathas v. Chmielewski:* The court also found that Chmielewski searched Chathas. The court found, however, that Judge Eiserman's security order included pat-downs, and that pat-downs could only be done by a female officer in the privacy of another room. The court found that the fact that Chmielewski also searched Chathas' purse was also proper since the purse could not be thoroughly searched with the hand scanner and all items—according to Judge Eiserman's orders—had to be checked for weapons.

*Chathas v. Ross and Ruffalo:* The court found that there was no evidence that Ross or Ruffalo detained or seized Chathas in any manner. While Ross blocked the door to the jury room, Ruffalo was in the jury room at all times. Chathas admitted at trial that she was able to leave when she wanted. Thus, there could be no claims against Deputies Ruffalo or Ross.

*Chathas v. the police officers:* The court found that there was no evidence to suggest any interaction between Chathas and the police officers. Once Chathas was searched in the jury room, there was no evidence showing that she was in any way restrained or detained. According to Chathas' own testimony, she was free to leave the jury room when she wanted, and in fact went to retrieve the statute book.

*Ellis v. Chmielewski:* Ellis presented no evidence regarding Chmielewski or that he even had any contact with her.

*Ellis v. DiCarlo:* DiCarlo merely used the hand-held metal scanner to search Ellis, and this was done pursuant to Judge Eiserman's order.

*Ellis v. Ross:* Ross helped the Evergreen Park police officers subdue Ellis, but that this was within the scope of Judge Eiserman's order to maintain security. There was no evidence of excessive force (again presumably under the *Gumz* standard).

*Ellis v. Ruffalo:* While Ruffalo was in the same room with Ellis, there is no evidence suggesting that he did anything.

*Ellis v. Cainkar:* The court stated that there was a "strong argument" to be made that Cainkar had absolute immunity for his conduct in instigating the involuntary commitment proceedings, but did not reach whether Cainkar had either qualified or absolute immunity. Rather, the court relied upon the seminal case of *McKinney v. George,* 726 F.2d 1183 (7th Cir.1984). In *McKinney,* this court held that the Fourteenth Amendment permits the police to arrest somebody and to take him to a men-

---

**2.** Plaintiffs have since abandoned their Sixth Amendment claim.

tal hospital rather than to jail him if they have probable cause to seize him.

The district court found that probable cause to send a person to a mental hospital exists when the police have reason to believe that the person poses a danger either to himself or to others. The district court's key finding is as follows:

> Ellis has failed to present evidence that would allow a reasonable jury to conclude that Cainkar and the Evergreen Park police officials did not have probable cause to take Ellis into custody and to transport him to Tinley Park Mental Hospital for 24–hour emergency observation.

The court emphasized that the provisions of the Illinois Mental Health Code are immaterial to the constitutionality of the conduct if the police have probable cause to take someone into custody.

The court then relied upon the Fourth Amendment to explain that the lesser the intrusion upon the individual, the lower the showing that must be made to impose this intrusion. As the court held, the intrusion imposed on Ellis—transport and detention for a maximum 24–hour period—is much less than an involuntary admission which could last much longer. The court then found that "[e]ven if the Evergreen Park police were not acting with probable cause, Ellis has not presented any information which would tend to disprove that they were objectively acting in good faith upon the belief that they had probable cause to take Ellis into custody for observation."

The court found that Judge Salerno's refusal to sign the papers shows that the judge had not observed any aberrant behavior, not that the police could not take Ellis into custody based upon Dr. Doshi's statements. The court concluded:

> Such a threatening statement conveyed to the police by Dr. Doshi is sufficient for the Evergreen Park Police Department as a matter of law to seize him and bring him in for observation. At least the Evergreen Park Police people did not know that they were violating any of Ellis' constitutional right in taking that course of action.
>
> Cainkar was acting in the good faith belief that the course of conduct he was recommending was proper under state law. Moreover, in relying on Dr. Doshi's statements and recommendation that Ellis be hospitalized, Cainkar was acting objectively reasonably.

After the plaintiffs unsuccessfully moved for a new trial, they filed timely a notice of appeal.[3]

## III. ANALYSIS

Plaintiffs alleged that the defendants, individually or collectively in a conspiracy, deprived them of three constitutional rights: an interest in not being committed to a mental institution in violation of state law, access to the courthouse, and being free from excessive force.[4] Plaintiffs allege that the defendants did not comply with the provisions of the Illinois Mental Health Code in committing Ellis. In particular, plaintiffs assert, and presented evidence at trial to show, that the physician's certificate which the defendants presented was outdated.

---

**3.** Plaintiffs did not file a notice of appeal as to defendant Evoy. Subsequent to oral argument in this matter, on June 1, 1988, a panel of this court held the appellant's failure to name Evoy to be corrected by a letter to his counsel and that this amendment would be allowed under the All Writs Act, 28 U.S.C. § 1651. *Chathas v. Smith*, 848 F.2d 93, 94 (7th Cir.1988). In *Torres v. Oakland Scavenger Co.*, — U.S. —, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), the Supreme Court subsequently held that naming the appellants is a jurisdictional requirement which cannot be waived even for good cause shown and that a court of appeals does not have jurisdiction over the appeal of an unnamed appellant. But the *Torres* decision only applies when a particular appellant is not named, not a particular appellee, and is based upon Fed.R.App.P. 3(c), which requires that appellants be named but does not require that appellees be specified. *See District of Columbia Nurses' Ass'n v. District of Columbia*, 854 F.2d 1448 (D.C.Cir.1988).

**4.** In the pretrial order, the parties stipulated that Cainkar was the Village attorney. Under Fed.R. Civ.P. 16, what is stipulated in the pretrial order governs the future course of litigation. Thus, this court need not reach in this case whether a private individual can be liable under § 1983 and, if so, what immunities he may assert.

If the issue were whether defendants complied with the governing state law, then we would have to reverse the district court's grant of a directed verdict. However, § 1983 only provides a remedy for federal law violations. As Ellis was not actually committed, he can at most allege that the defendants, in particular the Evergreen Park police officers, seized him without probable cause in violation of the Fourth Amendment. Under this theory, however, which is the only theory available to plaintiffs, if the defendants had probable cause, this would be an absolute defense to plaintiffs' claim. *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1344 n. 10 (7th Cir.1985).

The district court found that the defendants had probable cause to take Ellis into custody and to transport him to the Tinley Park facility for 24-hour emergency observation, or at the very least had a good-faith belief that they had probable cause. The evidence that plaintiffs presented at trial can lead only to this conclusion. Probable cause arises "at [the] moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). A police officer need not personally witness the behavior giving rise to the probable cause—even if there must be personal observation according to a state statute—and can rely on another officer's direction or a reliable informant (such as Dr. Doshi). *See, e.g., Karr v. Smith*, 774 F.2d 1029, 1031–32 (10th Cir.1985). If there is probable cause, it is irrelevant if the suspect turns out to be noncommittable. The arrest is still legal. *See Rodgers v. Lincoln Towing Service, Inc.*, 771 F.2d 194, 200 (7th Cir.1985); *McKinney, supra*, 726 F.2d at 1187.

Where the facts are undisputed, a court may determine whether probable cause existed. *Llaguno v. Mingey*, 763 F.2d 1560, 1565 (7th Cir.1985). There is every indication that the police reasonably believed Dr. Doshi's worries to be true. *See McKinney,* *supra*, 726 F.2d at 1187. Plaintiffs acknowledge in their opening brief that "[h]ad Ellis and/or Chathas walked into the courthouse brandishing guns or knives or threatening to 'blow away' the defendants, the defendants would have been justified in detaining them and in having one or both of them involuntarily admitted to a mental health hospital."

There was some evidence that Ellis could be safely confined within the courthouse. By the time the police confronted Chathas and Ellis, they already knew that Ellis was not armed and thus that he was not immediately dangerous. In addition, there was extra security at the courthouse. Yet that is not what probable cause requires. Rather, probable cause requires merely information sufficient to warrant a prudent police officer to believe that Ellis was dangerous. The evidence introduced by plaintiffs shows that Ellis had had several previous incidents in which he had used firearms when upset, including an incident in which he shot his niece and an incident in which he held the police officers at bay in his basement. In addition, Ellis had already received or was receiving psychiatric treatment from several sources. In terms of protecting both the safety of the officers and Ellis, it makes no difference whether his latest threat to "blow away" the defendants was made in the courthouse or a week before. Probable cause arose when the officers learned of the statements Ellis made to Doshi.

In this regard, the failure of the defendants to follow the procedures set forth in §§ 3–601 and 3–606 of the Illinois Mental Health Code does not by itself deprive Ellis of any liberty interest. A state-created procedural right is not itself a liberty interest. *McKinney, supra*, 726 F.2d at 1190. The only constitutional question is whether the police had probable cause within the meaning of the Fourth Amendment and on that question a reasonable juror could only conclude that they did.

Plaintiffs next interpose a "right of access." We agree with plaintiffs that access to the courts is part of our sacred heritage. But they do not specify where in the Constitution this right of access comes from. The right of access as the Supreme

Court defines it is "a right to sue and defend." *Chambers v. Baltimore & Ohio R.R. Co.*, 207 U.S. 142, 148, 28 S.Ct. 34, 35, 52 L.Ed. 143 (1907). Assuming the continuing validity of a substantive right of access to the courts, *see, e.g., Jackson v. Procunier*, 789 F.2d 307, 310 (5th Cir.1986), and even assuming a delay of access may be a constitutional deprivation, here plaintiff has not alleged in any fashion that he was prejudiced by the delay. Plaintiff does not allege how long his case was delayed, and does not allege how he was prejudiced. Indeed, we question whether he was prejudiced at all, for he ultimately won all of the pension benefits he sought. Even under this most broad reading, depriving the plaintiff of ultimate access is essential for plaintiff to allege and prove, and tellingly, plaintiff has not done so here.

■ Finally, plaintiffs allege that the defendants used excessive force in bringing Chathas into the jury room and Ellis to Tinley Park. The district court analyzed this issue under the standard set forth in *Gumz v. Morrissette*, 772 F.2d at 1396. Under the *Gumz* test, a state officer's use of force in an arrest is unconstitutional if it (1) caused severe injuries; (2) was grossly disproportionate to the need for action under the circumstances; and (3) was inspired by malice or shocked the conscience. 772 F.2d at 1400. We agree with the district court that the evidence presented by plaintiffs does not present sufficient facts to support a claim that any of the defendants violated the *Gumz* test. They have neither proven a severe injury nor malice on the part of any of the defendants in administering the alleged excessive force. In addition, a jury could not reasonably find from either Chathas' or Ellis' testimony that the use of force was grossly disproportionate. Simply put, while Chathas and Ellis testi-

fied to the force applied, they did not testify at all to the circumstances. Chathas did not testify as to whether she was willing to go to the jury room voluntarily, and indicated that her only goal was to get into the courtroom. The officers appear merely to have directed her to the jury room. Ellis testified that he tried to run away from the officers, and thought that if he could make it into the sanctuary of the courtroom, he would be provided with a refuge from the pursuing officers. Thus, and this is a point to which we will return, the plaintiffs have not shown that the force used by the defendants was disproportionate to the circumstances. Under all three elements of the *Gumz* test, defendants did not use excessive force.

Subsequently, this court overruled *Gumz* and outlined a new standard for excessive force in arrest cases. See *Lester v. City of Chicago*, 830 F.2d 706 (7th Cir.1987). Under *Lester*, we analyze excessive force under the Fourth Amendment, and find force to be excessive where it is unreasonable under the circumstances. The Supreme Court in *Graham v. Connor*, —— U.S. ——, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) recently endorsed the "objective reasonableness" standard under the Fourth Amendment, which is the same standard enunciated in *Lester*.

However, we had decided neither *Gumz* nor *Lester* at the time the defendants allegedly used excessive force (1981). At that time, the appropriate standard for excessive force claims in this circuit was unsettled.[5] The focus of our disagreement with the dissent seems to be confined to whether the plaintiffs made a prima facie case for excessive force (Ellis) and unreasonable seizure (Chathas) based on the standards which were clearly established in 1981. While Ellis claims he was punched or pum-

---

5. In 1982, this court held in *Blake v. Katter*, 693 F.2d 677, 682 (7th Cir.1982), that "an allegation of excessive force during an arrest is cognizable under § 1983." In *Blake*, we did not set forth any particular standard for evaluating excessive force in arrest claims but we did cite *Courtney v. Reeves*, 635 F.2d 326 (5th Cir.1981), a case that treated excessive force in arrest as violating the Fourteenth Amendment due process clause. At the time this court decided *Gumz*, most courts analyzing excessive force claims analyzed those claims as Fourteenth Amendment viola-

tions. See *Gumz*, 772 F.2d at 1399 and the cases it cites. As we noted in *Gumz, id.* at 1400, three circuits had already adopted the three-part test for analyzing excessive force claims that *Gumz* ultimately adopted. Two of these cases arguably involved excessive force in an arrest; none of these cases differentiated between excessive force in arrest and other examples of excessive force. See *Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir.1981); *Shillingford v. Holmes*, 634 F.2d 263 (5th Cir.1981); *Hall v. Tawney*, 621 F.2d

meled, and Chathas claims she was lifted or dragged, neither claim any injury. In 1985 we decided *Gumz v. Morrissette* which required, among other things, severe injury and malice or force which shocked the conscience. What the plaintiffs describe falls far short of the *Gumz* standard. We cannot assume a more lenient standard existed before *Gumz* nor can we assume the defendants should have anticipated the objective reasonableness standard announced when *Lester v. City of Chicago* overruled *Gumz* in 1987.

■ Qualified immunity protects the defendants for their acts in 1981. If the hypothetical Evergreen Park officer had opened a law book in 1981, he would not have been unreasonable in concluding that conduct that did not violate the standard *Gumz* ultimately adopted would not violate the Constitution. And as the district court correctly found, the defendants satisfied the *Gumz* requirements. Thus, the undisputed evidence shows that under the circumstances painted by the plaintiffs, the conduct of the defendants did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

We do not have to decide whether the plaintiffs made a case under the objective reasonableness standard given the state of the law when the defendants acted. Even under *Lester,* however, as noted above, plaintiffs have not shown that the defendants' actions—which they themselves describe merely as some physical contact—was unreasonable under the circumstances. As noted above, Chathas never testified that she was willing to proceed voluntarily. Ellis testified that he would not proceed voluntarily. In *Lester,* this court emphasized that not every push and shove would form the basis for a Fourth Amendment claim. We need not set forth what possible combination of circumstances would make the force the defendants used unreasonable. We hold merely that plaintiffs did not prove or offer evidence to prove those circumstances here.

607, 613 (4th Cir.1980) (cited by both *Wise* and

Because the only allegation against Cainkar was that he conspired with the other defendants to violate the plaintiffs' constitutional rights and because the other defendants cannot be found liable, Cainkar also cannot be liable. Although the district court held that Cainkar was entitled to absolute immunity, we need not decide this issue because Cainkar, like the other defendants, either did not violate anybody's constitutional rights or was qualifiedly immune.

Finally, while plaintiffs allege that all the defendants actively conspired to deprive them of their constitutional rights, plaintiffs and the evidence they presented at trial did not support these conclusory allegations. This failure to present supporting evidence of any conspiracy means that the qualified immunity to which the defendants are entitled cannot be defeated. See *Myers v. Morris,* 810 F.2d 1437, 1453 (8th Cir. 1987); *Hollowell v. Gravett,* 703 F.Supp. 761, 764 (E.D.Ark.1988).

Because plaintiffs have not shown that defendants violated any of their *constitutional* rights or have not overcome the qualified immunity to which defendants are entitled, we must affirm the district court's decision.

AFFIRMED.

FAIRCHILD, Senior Circuit Judge, concurring in part, dissenting in part.

I can agree that the information Dr. Doshi gave the Evergreen Park Police was probable cause to believe that Ellis' mental condition made him dangerous to himself or others. For the content of probable cause in this context, *see McKinney v. George,* 556 F.Supp. 645, 650 (N.D.Ill.1983), *aff'd* 726 F.2d 1183; *Baltz v. Shelley,* 661 F.Supp. 169, 178–79 (N.D.Ill.1987). *See also,* Annotation: *Right, Without Judicial Proceeding, to Arrest and Detain One Who Is, or Is Suspected of Being, Mentally Deranged,* 92 A.L.R.2d 570 (1963 & Supps.1983 & 1989).

Because the officers had probable cause, arrest of Ellis in order to convey him to the

*Shillingford*).

mental hospital for examination and possible commitment would be reasonable under the Fourth Amendment, and failure to comply with state requirements would be immaterial. *McKinney v. George*, 726 F.2d 1183, 1187–88 (7th Cir.1984). With all respect, however, my examination of the record leads me to conclude that Ellis sufficiently made out a *prima facie* case that he was subjected to excessive force by the defendants he identified.

I can agree that the court order requiring a search for weapons justified the deputies in searching Chathas. In my opinion, however, her testimony, if believed, that DiCarlo and another deputy, after failing to respond to her request for an explanation, lifted her up by the arms and took her to the jury room, made out a *prima facie* case of unreasonable seizure of her person in violation of the Fourth Amendment.

On the point of qualified immunity, I do not agree that plaintiffs' Fourth Amendment rights had not been clearly established.

As to the other claims asserted by plaintiffs, I agree that the District Court correctly directed a verdict.