**CANADIAN PUBLIC SCHOOL DIS-
TRICT NUMBER 2, Appellant,**

v.

**McGRAW–EDISON MANUFACTURING
COMPANY, a corporation, and C. C. I.
Gas Company, a corporation, Appellees.**

No. 52717.

Court of Appeals of Oklahoma,
Division No. 2.

Sept. 1, 1981.

Released for Publication by Order of
Court of Appeals Oct. 2, 1981.

Ronald L. Day, Stephen B. Peterson, Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, for appellant.

J. Warren Jackman, John S. Zarbano, Pray, Walker, Jackman, Williamson & Marlar, Tulsa, for appellee McGraw-Edison Manufacturing Co.

Richard D. Gibbon, Brad Smith, Gibbon, Gladd, Taylor, Smith & Hickman P. A. Tulsa, for appellee C. C. I. Gas Co.

BRIGHTMIRE, Judge.

Did plaintiff's evidence at trial establish prima facie that the defendants were tor-

tiously liable for the destruction of its public school house? The trial court held it did not and sustained the demurrer of each defendant. Plaintiff appeals. We hold the evidence established a cause of action against both defendants, reverse the judgment below and remand for a new trial.

I

Plaintiff, Canadian Public School District No. 2, Pittsburg County, Oklahoma, filed this lawsuit against the maker of an unvented gas heating stove, McGraw-Edison Manufacturing Company, and a supplier of natural gas, C. C. I. Gas Company, to recover $550,000 damages for the burning of the school building and its contents.

The allegations were that early in the morning of November 30, 1974, during a Thanksgiving recess, pressure in the gas company's lines dropped to zero and as a result several gas burning stoves in the school building were temporarily turned off. A short time later, when normal pressure was thought to have been restored, the heaters were relighted. As it turned out, however, full pressure had not been restored at the time of the relighting and consequently when pressure increased during the next two or three hours, stove flames grew sufficiently to ignite gas leaking from a defective pilot valve connection in the stove. This resulted in bilateral flames flaring from the faulty joint, the bottom tongue of which reached or nearly reached the pine wood floor four and a half inches below. This flame either alone or in combination with the 1,000 degree heat generated by the higher burner flames was of sufficient intensity to ignite the flooring and produce a fire that eventually engulfed the entire facility.

The theory of the school district's action against the gas company was negligence. The gas supplier was accused of failing to use the degree of care required of it in several respects: (1) it failed to maintain an adequate and steady pressure in its gas lines; (2) it neglected to shut off the school gas meter upon discovery of the outage; (3) it did not warn plaintiff of the decrease in gas pressure on the morning of November 30, 1974, or advise that restoration would be gradual and fluctuating for quite some time; (4) it declined to warn plaintiff of the hazards of reigniting its gas stoves during the repressurization period.

With regard to McGraw-Edison the plaintiff pleaded manufacturer's products liability. The theory was that the stove that started the fire was one McGraw-Edison produced and that it was defective in both design and manufacture in several respects which rendered it unreasonably dangerous. This, pled plaintiff, contributed, in combination with the negligence of the gas company, to the cause of the fire.

Plaintiff alleged the replacement cost of the building was $450,000 and its loss of use during reconstruction amounted to $100,000.

Trial of the case began December 7, 1976. Plaintiff adduced evidence until resting on December 14. The trial judge sustained the demurrer of each defendant to plaintiff's evidence precipitating this appeal.

II

The evidence was substantially as follows. The school district's custodian, John Collins, arose early that November morn and was preparing to enjoy the holiday when suddenly, at about 0600 hours, he noticed the natural gas pressure on his home heater go down. He immediately turned off all gas appliances in his house and went over to the school building because the classrooms there were heated by gas stoves left burning during the recess.

The product said to be defective was a stove located in the southwest corner of the English classroom. It was manufactured by McGraw-Edison sometime between 1965 and 1968 and was described by the maker's literature as an unvented, free standing gas heater, Model No. A430P. This stove was about 25 inches high, 21.5 inches wide, nearly 11 inches deep, and it had a ⅜ inch gas connection. A brochure published by McGraw-Edison boasted that "[t]he always safe to touch cool cabinet allows this heater

to be used almost anywhere ... safely ... close to furniture, draperies, or walls without fear of damage. The sides, back and top, never get hot .... A free standing pilot on Natural Gas Models, offers the convenience of once a season lighting. The ... cast iron burner offers lifetime trouble free service." This heater, which we will call the English room stove, had been left on during the holiday recess to keep the classroom from becoming too cold.

When custodian Collins got to the school that morning he found that some of the gas stoves were still burning and he proceeded to turn them all off. He opened the doors to air out the building and about 45 minutes later, around 0700 hours, he decided the gas lines had been repressurized and relit the stoves. He adjusted the flame of the English room stove to a height of about two inches, left, locked the door and did not return to the room again.

Around 1100 hours a high school student, Allen Rogers, arrived at the school for basketball practice. He noticed a slight haze in the hallway but it was not of sufficient density to provoke an investigation.

After practice Rogers and another student walked down the hallway and smelled smoke. They investigated and discovered smoke coming from under the English room door. Through the door window they saw a smoke-filled room and a blaze in just one place—in and around the English room stove. It looked like the stove was on fire, Rogers said, with flames at "the bottom of the stove against the floor" rising to a height of about ten inches.

The boys forced the door open and the flames got larger. They smelled a strong odor of natural gas. Someone turned the lights on.

Rogers withdrew and reported the fire to his coach who was in the restroom. Then the student went to a nearby building for a fire extinguisher and returned to the room. Because of the rising smoke he got on the floor—which was not hot—and crawled to the vicinity of the fire and sprayed it. By now, however, the flames had leaped high enough to ignite the shades and finally the ceiling. The boys retreated to the outdoors where they watched helplessly while the fire consumed the educational institution.

An official of the gas company, Raymond Teal, vice president and manager, testified that an emergency outage occurred on the morning in question around 0600 hours as a result of condensate freezing in and obstructing the main gas line supplying the town of Canadian and the school. The ice barrier, he said, was thawed with a blow torch around 0700 hours. Repressurization of the line soon began and increased until between 0900 and 1000 hours when a full pressure of seven ounces was attained in the school line.

Teal conceded that many of the procedures prescribed in the gas company's procedure manual specifying what should be done in the event of an emergency outage were not followed on November 30, 1974.[1]

---

1. C. C. I. Gas Company prepared a "Distribution Procedures Manual" and filed it with the Oklahoma Corporation Commission January 14, 1971, in conformance with the corporation commission's general safety regulations and the Minimum Federal Code for Safety Standards Governing the Construction, Maintenance and Operation of Pipeline Facilities within the State of Oklahoma. Part XIX of the manual reads in part as follows:

"ACTIONS TO BE TAKEN
IN THE EVENT OF AN
EMERGENCY GAS OUTAGE

(1) Notify the proper personnel to report to office and then dispatch crew to turn off valve at each service.
(2) Inform police and fire department, also city officials.

(3) If cause of outage is on our system, make repairs.
(4) As soon as the repairs are completed and the gas has been shut off at every service, purge and repressure the mains.
(5) During repressurizing of the mains, odorization of the gas shall be increased above normal where odorizers make this practical.
(6) Resume service to customer on priority basis such as hospitals, etc., then resume service to others. No gas will be admitted to any building if an occupant is not present. Appropriate notice shall be left at these locations.
(7) Throughout the emergency, keep the locally affected consumer advised of the situation and progress being made by the best mean possible.

For instance the lines were not purged before commencing repressurization of the lines. Nor did the gas company turn the gas off at the school meter, or notify school officials of the outrage and advise of the anticipated time lapse before restoration of regular service.

These facts, as we shall discuss later, were causally connected to the fire by considerable expert testimony highlighted by one of plaintiff's experts, Robert Block, Ph.D., Associate Professor of Metallurgical Engineering at the University of Oklahoma. In the interest of brevity we shall touch only on certain salient features of such evidence.

The English room stove, or what was left of it, was retrieved from the rubble, saved by plaintiff and ultimately placed in evidence. It had been examined by metallurgist Block along with an undamaged prototype because a vital part of subject stove—the pilot valve and tubing—melted in the holocaust.

Block found that the design of the pilot valve was defective causing the stove to be unreasonably dangerous because of its tendency to leak. Specifically the expert pointed out that joinder of the brass pilot valve was accomplished by tapping it into the small ⅜ inch manifold pipe. This design violated construction requirement 1.10.2 promulgated by the American National Standards Institute (ANSI) and approved by the American Gas Association (AGA)[2] —a standard aimed at eliminating weak and leak-prone joints. The facts here dramatically demonstrate the merit of ANSI 1.10.2. The wall of the ⅜ inch supply line was too thin to allow a run of the required 3½ threads and, therefore, the joint could not be made secure enough to adequately retain its natural gas content and it was given to cross threading (crooked screwing in of the valve fitting). As an example of the latter problem Block drew attention to the fact that the pilot valve pipe on the prototype stove was screwed in cockeyed at the factory, and, incidentally, the joint leaked when tested by the witness.

In addition to these facts Block noticed a burned spot on the back side of subject stove's firebox adjacent to what earlier had been the location of the pilot valve. The upward reaching flame pattern was such, said Block, that it had to be produced by a leak from the pilot valve manifold joint and, given the nature of the leak, the metallurgist thought it likely that if one flame shot upward, another headed downward toward the floor—a floor that consisted of aged pine boards having a kindling temperature of about 450 degrees fahrenheit.

Tying all these facts and factors together, Block reached the following conclusion. When the custodian relighted subject stove that morning, the gas pressure was low; as pressure increased over the next two hours, both the escape of gas from the pilot valve connection and the burner flames increased, until finally they met and ignited resulting in a bifurcated flame from the pilot valve connection—one tongue of which shot upward creating the burn pattern on the firebox metal and the other of which shot downward close enough to the floor to eventually ignite it.

### III

■ To make out a case of manufacturer's products liability the plaintiff must prove that: (1) the product was defective when it left the supplier; (2) the defectiveness rendered the product unreasonably dangerous to person or property; and, (3) the defectiveness caused or contributed to the cause of harm to plaintiff.[3]

---

(8) Prepare a written report stating cause of outage, number of customers affected and length of time of the outage or equipment failure. This report shall be made a permanent part of the office files."

2. ANSI 1.10.2—Standard for unvented room gas heaters reads:

"Piping tapped for gas valves, pilots, lighters, or other branch supply lines, shall provide a continuous run of not less than 3½ American Standard taper pipe threads."

3. *Kirkland v. General Motors Corp.*, Okl., 521 P.2d 1353 (1974).

■ The facts we have narrated demonstrate rather convincingly that the English room heater was possessed of both an unreasonably dangerous design and functional defect when it left McGraw-Edison's assembly plant—defects which permitted the unintended escape of natural gas. This leakage when combined with other factors became an essential causational link in the chain of events culminating in the school's fiery decimation. Thus when it rested, the school district not only had proved its case against McGraw-Edison but it had done so with such professional thoroughness that the record at this point contains no suggestion of any other reasonably possible explanation for the origin of the fire.

McGraw-Edison's demurrer to plaintiff's evidence should have been overruled.[4]

### IV

■ We turn now to the question of whether the school district proved negligence on the part of the gas company. The essentials of what plaintiff has to prove are quite elementary. To begin with the gas company distributes a dangerous product and consequently is legally obliged to exercise a high degree of care and vigilance to prevent its gas from causing harm. The proper performance of this duty requires the distributor to take "every reasonable precaution suggested by experience and the known danger of the escape of gas . . . ."[5] And so to develop a case of liability plaintiff had to present evidence that the gas company (1) breached this duty and (2) the nonfulfillment of the duty caused or contributed to the cause of plaintiff's injury.

■ The gas company's admitted failure to follow the minimal requirements of its own emergency outage procedure—not purging the lines, cutting off gas at the school's meter, and notifying school officials of outage—is, as a matter of law, a gross dereliction of the duties prescribed in its procedures manual.[6]

The only unresolved question that remains is whether these transgressions could be found by reasonable persons to have a causal nexus to the school's blazing annihilation. We think they could—at least with respect to the failure to cut the gas off and to notify school officials.[7] Had the school's gas supply been cut off at the meter the custodian obviously would have been unable to relight the subject stove until normal pressure had been restored, thus reducing the ignition threat of the gas escaping from the pilot valve to something less than a possibility. And by the same token if the gas company had notified the officials of the outage and requested the shut off of all gas equipment until normal pressure had been restored the defective stove would have been prevented from doing its thing. Of considerable significance in this regard is the testimony of the McGraw-Edison engineer who designed subject stove. He thought that the most likely cause of the fire was the increased post-outage pressure.

We hold that plaintiff's evidence raised a substantial question concerning the gas company's contribution to the cause of the fire and this was a matter for the jury to resolve.

The judgment below is reversed and the cause remanded with directions to grant plaintiff a new trial.

BACON, P. J., and BOYDSTON, J., concur.

---

4. *Id.*; *Kimbrell v. Zenith Radio Corp.*, Okl., 555 P.2d 590 (1976); *Tigert v. Admiral Corp.*, Okl. App., 612 P.2d 1381 (1980).

5. *Oklahoma Gas & Elect. Co. v. Oklahoma Ry.*, 77 Okl. 290, 188 P. 331 (1920).

6. See note 1, supra.

7. Less attractive as a causative factor is the gas company's failure to purge the lines. Of course, it might be said that the gas company's neglect on this occasion provided inferential evidence that it had failed to purge its lines after previous freeze-ups thus laying a foundation for the build-up of hydrate over a period of time to an extent great enough to effect a total line obstruction upon freezing. The main trouble with this theory is, however, there is not sufficient evidence from which to draw the inference.