930 F.2d 35
 Unpublished Disposition
NOTICE: Tenth Circuit Rule 36.3 states that unpublished opinions and orders and judgments have no precedential value and shall not be cited except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel.
Lloyd H. SWEGER, et ux, Plaintiffs-Appellants,
v.
TEXACO, INC., Chevron U.S.A., Inc., Pennzoil Company, Sun
Oil Company, Mobil Oil Corporation, Atlantic
Richfield Co., Texaco Refining and
Marketing Inc., Defendants-Appellees,
Sinclair Oil, Gulf Oil Corporation, Phillips Oil
Corporation, Defendants.
Lloyd H. SWEGER, et ux., Plaintiffs-Appellees,
v.
TEXACO, INC., Pennzoil Company, Sinclair Oil, Gulf Oil
Corporation, Phillips Oil Corporation, Texaco
Refining and Marketing Inc., Defendants,
Chevron U.S.A., Inc., Sun Oil Company, Mobil Oil
Corporation, Atlantic Richfield Co.,
Defendants-Appellants.
Lloyd H. SWEGER, et ux., Plaintiffs-Appellants,
v.
TEXACO, INC., Sinclair Oil, Gulf Oil Corporation, Phillips
Oil Corporation, Defendants,
Chevron U.S.A., Inc., Pennzoil Company, Sun Oil Company,
Mobil Oil Corporation, Atlantic Richfield Co.,
Texaco Refining and Marketing Inc.,
Defendants-Appellees,
 Nos. 88-1781, 88-1834 and 88-2745.
 United States Court of Appeals, Tenth Circuit.
 Feb. 22, 1991.
 
 Before BALDOCK and EBEL, Circuit Judges, and SAM, District Judge.*
 ORDER AND JUDGMENT**
 EBEL, Circuit Judge.
 
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. Therefore, the case is ordered submitted without oral argument.
 
 
 2
 Plaintiffs, Mr. Lloyd H. Sweger and Mrs. Jayn Kennedy Sweger, brought this products liability claim in the federal district court of the Western District of Oklahoma, alleging that Mr. Sweger's exposure to motor oils produced by defendants caused his cancer. Because jurisdiction is based on diversity of citizenship, Oklahoma's substantive law of products liability governs this case. The district court granted summary judgment to defendants on the issue of causation and awarded costs to defendants as the prevailing parties. However, the district court denied the summary judgment motion filed by defendants which argued that plaintiffs' claim was barred by the statute of limitations. Plaintiffs appeal both the summary judgment order and the award of costs.[1] We affirm.
 
 BACKGROUND
 
 3
 Mr. Sweger has been a mechanic for the majority of his life, and, consequently, he has been exposed to large amounts of new and used motor oils. Mr. Sweger alleges that he worked with motor oil manufactured by each of the named defendants.
 
 
 4
 In 1971, Mr. Sweger was diagnosed as having transitional cell cancer of the urinary system. In 1984, Mr. Sweger was diagnosed as having cancer of the colon. The greatest risk factor for Mr. Sweger's colon cancer was the existence of the first transitional cell cancer. It was not until 1985, when Mr. Sweger was told by a reporter that he might have a cause of action against manufacturers of motor oil, that Mr. Sweger took steps to determine what caused his cancer. In 1986, plaintiffs filed this products liability suit against defendants alleging that Mr. Sweger's exposure to defendants' motor oils caused his cancer.
 
 
 5
 To show a causal link between the defendants' motor oils and Mr. Sweger's cancer, plaintiffs rely on the deposition testimony of their expert witness, Dr. Daniel Teitelbaum. Dr. Teitelbaum is a proponent of the "one-molecule theory" of cancer formation. Under the one-molecule theory, as explained by Dr. Teitelbaum, cancer results from the interaction between a single molecule of a carcinogen and a single molecule of the recipient deoxyribonucleic acid (DNA). For cancer to form, the DNA molecule must first be hit by an "initiator" molecule. After the first hit by the initiator molecule, if a "promoter" molecule hits the DNA molecule, the DNA molecule may begin producing cancer.
 
 
 6
 Although Dr. Teitelbaum stated that he believed that Mr. Sweger's cancer could have been caused by exposure to a single carcinogenic molecule of defendant's motor oils, he could not state which of defendants' motor oils acted as the promoter molecule or when the interaction of the molecules causing the cancer occurred. Defendants Pennzoil and Texaco moved for summary judgment arguing that plaintiffs' reliance on Dr. Teitelbaum's testimony was insufficient to show that defendants' motor oils caused Mr. Sweger's cancer. All defendants moved for summary judgment on statute of limitations grounds.
 
 
 7
 The district court denied summary judgment on the issue of the statute of limitations. However, because the district court found that all defendants were similarly situated, it granted summary judgment in favor of all defendants on the issue of causation raised by Pennzoil's and Texaco's motion for summary judgment.[2] Subsequently, the court awarded aggregate costs of over $11,000 to defendants as the prevailing parties. The costs covered the expense of taking various depositions. Plaintiffs appeal the order granting summary judgment in favor of defendants and the award of costs to defendants.
 
 JURISDICTION
 
 8
 Two issues have been raised concerning whether we have jurisdiction to hear this appeal. The first issue is whether an arguably premature notice of appeal later ripened giving us jurisdiction. The second issue is whether plaintiffs' notices of appeal were adequate in light of Torres v. Oakland Scavenger Co., 487 U.S. 312 (1988). As discussed below, we hold that plaintiffs' notices of appeal were adequate and therefore we have jurisdiction to hear these appeals.
 
 I. Premature Filing of the Notice of Appeal
 
 9
 On May 11, 1988, Plaintiffs filed their notice of appeal from the district courts' April 12, 1988 summary judgment order. On September 14, 1988, this court issued an Order to Show Cause because several defendants listed in plaintiffs complaint were not discussed in the district court's April 12, 1988 order and therefore it was unclear whether the order was a final judgment as to all defendants. Plaintiffs filed in district court a motion to clarify the judgment. On October 24, 1988, the district court granted the motion and clarified that the April 12, 1988 summary judgment order was final as to all claims and all parties. Subsequent to the district court's order of clarification, plaintiffs did not file a new notice of appeal.
 
 
 10
 Plaintiffs' motion to clarify was not drafted as a tolling motion under Fed.R.App.P. 4(a)(4) and did not call into question the correctness of the decision but only sought a clarification of which defendants interests were being adjudicated. See Hasbrouck v. Texaco, Inc., 879 F.2d 632, 636 (9th Cir.1989); see also Brown v. United Ins. Co. of America, 807 F.2d 1239 (5th Cir.1987) (per curiam). Moreover, because the motion was filed more than ten days after the summary judgment order was entered, we do not necessarily have to treat it as a Rule 59(e) motion. See Dalton v. First Interstate Bank of Denver, 863 F.2d 702 (10th Cir.1988).
 
 
 11
 When Rule 4(a)(4) is not implicated, the Tenth Circuit has adopted the procedure whereby a premature notice of appeal ripens if the court notifies "the parties of our observation of the apparent jurisdictional defect," and the parties "secure ... an order or judgment explicitly adjudicating all remaining claims" by the date ordered by this court. Lewis v. B.F. Goodrich Co., 850 F.2d 641, 645 (10th Cir.1988) (en banc); see also Fed.R.App.P. 4(a)(2). Because the procedure adopted in Lewis was properly followed, the premature notice of appeal ripened after the district court filed its October 24, 1988 order of clarification. Therefore, we have jurisdiction to hear the appeal.
 
 
 12
 Defendant Pennzoil argues that Lewis is modified by Torres v. Oakland Scavenger Co., 487 U.S. 312 (1988). Pennzoil reads Torres as holding that jurisdictional flaws are never harmless and can never be cured by later corrections. However, Pennzoil's reading of Torres is overly broad. Because the Court in Torres was primarily concerned with the requirements of Fed.R.App.P. 3(c) and did not address the issue of premature notices of appeal, Torres does not require us to alter the procedure set forth in Lewis.
 
 
 13
 II. Adequacy of the Plaintiffs' Notices of Appeal Under Torres
 
 
 14
 We also review plaintiffs' notices of appeal for any deficiencies under Torres. The Supreme Court in Torres v. Oakland Scavenger Co., 487 U.S. 312, 318 (1988), held that the appellants' use of the term "et al." and their failure to list each appellant by name in the notice of appeal, was a jurisdictional bar to suit by the unnamed appellants, because the notice of appeal deprived both the court of appeals and the appellees of fair notice of who was filing the appeal. Plaintiffs first argue that Torres should not be applied retroactively. However, because we find that the notice of appeal is adequate under Torres, we do not consider the issue of retroactivity.
 
 
 15
 The notices of appeal filed by plaintiffs for appeals Nos. 88-1781 and 88-2745 lists "Lloyd H. Sweger, et ux, Plaintiffs," as the appellants. R.Docs. 198 & 225. The captions of the notices of appeal also list the appellees as "Texaco Inc., et al, Defendants." Id. The Court's concerns in Torres of lack of notice do not arise with the use of "et ux" because the term "et ux," which means "and wife," refers to only one person. See Black's Law Dictionary 497 (5th ed. 1979). Therefore, plaintiffs' failure to list Mrs. Sweger by name in the notice of appeal does not bar this suit.
 
 
 16
 Similarly, appellants' use of "et al." to indicate the appellees does not deprive us of jurisdiction. Torres is premised on the requirements of Fed.R.App.P. 3(c), which specifies only that the appellants be named. Therefore, Torres does not mandate that all appellees be specifically named in the notice of appeal in order for the appellate court to have jurisdiction. See Chathus v. Smith, 884 F.2d 980, 986 n. 3 (7th Cir.1989), cert. denied, 110 S.Ct. 1169 (1990); Appeal of District of Columbia Nurses Assoc., 854 F.2d 1448, 1450 (D.C.Cir.1988) (per curiam), cert. denied, 109 S.Ct. 3189 (1989).
 
 SUMMARY JUDGMENT
 
 17
 When reviewing the grant or denial of a summary judgment motion, we apply the same standard as that used by the district court. Specifically, we determine whether there is a genuine issue as to any material fact and whether the moving party is entitled to a judgment as a matter of law. See Osgood v. State Farm Mut. Auto. Ins. Co., 848 F.2d 141, 143 (10th Cir.1988). The record is viewed in the light most favorable to the opposing party. See Ewing v. Amoco Oil Co., 823 F.2d 1432, 1437 (10th Cir.1987). Summary judgment may be entered against a party who fails to make a sufficient showing of the existence of an essential element to its case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).
 
 
 18
 In Kirkland v. General Motors Corp., 521 P.2d 1353 (Okla.1974), the Oklahoma Supreme Court held that under Oklahoma law in order to maintain a product's liability action against a manufacturer, a plaintiff must prove that: (1) the product caused the injury, (2) the defect which caused the injury existed in the product at the time that it left the manufacturer's control, and (3) that the defect made the product unreasonably dangerous to plaintiff or plaintiff's property. Id. at 1363. Because the district court entered summary judgment in favor of defendants on the issue of causation, the critical issue on appeal is whether plaintiffs made a sufficient showing of the existence of the essential element of causation such that there existed a genuine issue of material fact.
 
 I. Causation
 
 19
 Under Oklahoma products liability law, a plaintiff must prove that the product was the actual cause of the injury; "the mere possibility that it might have caused the injury is not enough." Id. at 1363; see also McMurray v. Deere and Co., 858 F.2d 1436, 1439 (10th Cir.1988); Kirkland, 521 P.2d at 1366.
 
 
 20
 In Case v. Fibreboard Corporation, 743 P.2d 1062 (Okla.1987), the Oklahoma Supreme Court rejected the "market share theory" of liability when the plaintiff is unable to identify specific tortfeasors. Case was a products liability action brought against asbestos manufacturers where the plaintiffs were unable to identify the "precise products to which [Mr. Case] had been exposed or the precise manufacturers of those products." Id. at 1063. The court rejected any form of collective liability in that situation because collective liability would eliminate the necessity of proving a causal link between a plaintiff's injury and a particular defendant's product. Case, 743 P.2d at 1064-66. The court found a distinction between the market share liability involved in DES cases, see Sindell v. Abbott Laboratories, 607 P.2d 924, cert. denied, 449 U.S. 912 (1980), and asbestos cases because "DES was produced from a single formula and produced injury when used in a singular context.... Asbestos, on the other hand, is a name applied to a family of minerals, each a member of which carries a different degree of risk." Case, 743 P.2d at 1065.
 
 
 21
 To the extent that plaintiffs' case utilizes the market share theory of liability, we must interpret and rely upon Case. Recently, this court decided a case that is relevant to our analysis. In Dillon v. Fibreboard Corp., 919 F.2d 1488 (10th Cir.1990) the court reversed the lower court's determination that there was insufficient causation to link the decedent's cancer to the defendants' asbestos products. The court found that because a witness "specifically identified defendant's products as present at the refinery, and because Mr. Dillon himself testified that he physically handled all the kinds of asbestos insulation products ..., Mr. Dillon offered rebuttal evidence which supports a 'significant probability' that Mr. Dillon's illness was caused by defendants' products...." Id. at 1492.
 
 
 22
 Clearly, Mr. Sweger was also able to identify the specific products with which he came in contact over the years. To this extent, his case is similar to plaintiff's claim in Dillon and meets some of the requirements of Case. However, Mr. Sweger's situation differs in two significant and decisive ways.
 
 
 23
 First, plaintiffs allege that Mr. Sweger's cancer was initiated by only one exposure, and they could not identify which, if any, of the defendants' products caused the cancer. Plaintiffs relied on the expert testimony of Dr. Teitelbaum to establish the requisite causal link. Although Dr. Teitelbaum stated that Mr. Sweger's use of defendants' motor oils heightened his exposure to carcinogens which possibly caused his cancer,[3] Dr. Teitelbaum testified that he could not state which brand of motor oil, if any, was the cause of Mr. Sweger's cancer.
 
 
 24
 Q. But if I understand correctly, you can't tell us when that single event occurred in your belief that caused Mr. Sweger's cancer; is that correct?
 
 
 25
 A. That's correct.
 
 
 26
 Q. And you can't tell us which brand of these motor oils it was that was responsible for that one molecular interaction with the one molecule of DNA, can you?
 
 
 27
 A. That's correct. I can't single out which one would have been the cause--the cause.
 
 R.Doc. 176 at 67.[4]
 
 28
 Plaintiffs argue that if any conflict exists between the one-molecule theory and Dr. Teitelbaum's testimony that the motor oils contributed to the cause of Mr. Sweger's cancer, we should reject the one-molecule theory. But it is clear to us that plaintiffs' trial allegations must be rejected under Case. Plaintiffs did not establish in opposition to the motion for summary judgment anything more than a claim that one of the defendants' products possibly caused Mr. Sweger's cancer. Unlike Dillon, where plaintiffs demonstrated a significant probability that the asbestos-related cancer occurred from repeated and collective exposure to all of defendants' products, plaintiffs' attempt to rely upon a theory akin to the collective share theory of liability, while having to concede that only one unidentified product may have caused the cancer. In other words, plaintiffs have claimed that of the many products to which Mr. Sweger was exposed, one acted as the sudden initiator of his cancer, although they cannot identify which one, if any, was responsible. Oklahoma has specifically rejected this form of liability.
 
 
 29
 The second decisive distinction goes directly to the requirement of causation as set fourth in Kirkland. Even if we were to disregard Dr. Teitelbaum's one-molecule theory, his testimony does not establish a causal link between any of defendants' products and Mr. Sweger's cancer with the certainty required by Oklahoma law. Dr. Teitelbaum testified that it was possible that the motor oils were not a factor in the development of Mr. Sweger's cancer.[5] When read in context, Dr. Teitelbaum's statements at best merely support a finding that Mr. Sweger's exposure made him more vulnerable to cancer.[6] Under Oklahoma law, the fact that Dr. Teitelbaum testified that the motor oils may not have been a factor in the development of Mr. Sweger's cancer is fatal to plaintiffs' claim.[7] See Kirkland, 521 P.2d at 1363, 1366. Compared to the facts of Dillon and Canadian Public School Dist. No. 2 v. McGraw-Edison Mfg., 634 P.2d 782 (Okla.App.1981),[8] Dr. Teitelbaum's generalized statements do not provide the necessary certainty under Oklahoma law to establish causation, an essential element of plaintiffs' cause of action.
 
 
 30
 Therefore, under Celotex Corp. v. Catrett, 477 U.S. 317 (1986), summary judgment in favor of defendants was correctly entered.
 
 II. Award of Costs to Defendants
 
 31
 Plaintiffs also challenge the district court's decision to award to defendants as the prevailing parties, the costs incurred in taking depositions. Federal Rules of Civil Procedure 54(d) states that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed.R.Civ.P. 54(d); see 28 U.S.C. Sec. 1920. The district court's decision to award costs is reviewed for an abuse of discretion. See U.S. Industries, Inc. v. Touche Ross & Co., 854 F.2d 1223, 1245 (10th Cir.1988).
 
 
 32
 The costs of depositions reasonably necessary to the litigation of the case can be awarded by the court under 28 U.S.C. Sec. 1920(2).[9] See Furr v. AT & T Technologies, Inc., 824 F.2d 1537, 1550 (10th Cir.1987); Ramos v. Lamm, 713 F.2d 546, 560 (10th Cir.1983). "[I]f the court finds the costs were for materials or services necessarily obtained, the amount of the award requested must be reasonable." Touche Ross, 854 F.2d at 1245. Where there is a statutory basis for the costs, there is a presumption in favor of awarding costs. See Touche Ross, 854 F.2d at 1245; Furr, 824 F.2d at 1550. The losing party bears the burden of overcoming this presumption. See Serna v. Manzano, 616 F.2d 1165, 1167 (10th Cir.1980).
 
 
 33
 The only reason offered by plaintiffs as to why they should not be charged with the costs is that they are of limited financial means.[10] Although the district court may consider the financial capabilities of a party in deciding whether to award costs, it is not an abuse of discretion to award costs even where the financial capabilities of the party are limited. See, e.g., Jones v. Continental Corp., 789 F.2d 1225, 1233 (6th Cir.1986); McCabe v. City of Chicago, 593 F.Supp. 665, 669 (N.D.Ill.1984) (Although the losing party was "hard-pressed" to pay the costs, reasonable costs were charged against the losing party.); American Key Corp. v. Cumberland Assoc., 102 F.R.D. 496 (N.D.Ga.1984).
 
 
 34
 Plaintiffs do not argue that they are indigent, but merely argue that it would be difficult for them to pay the costs because of their limited income. Plaintiffs have failed to carry their burden of overcoming the presumption favoring an award of costs. Therefore, we hold that the district court did not abuse its discretion in awarding costs to defendants as prevailing parties.
 
 CONCLUSION
 
 35
 Because plaintiffs failed to establish a causal link between the cancer and defendants' motor oils, the district court's April 12, 1988 summary judgment order is AFFIRMED. The taxation of costs against the plaintiffs is also AFFIRMED.
 
 
 
 *
 The Honorable David Sam, of the United States District Court for the District of Utah, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 Four of the defendants cross-appeal the denial of summary judgment as to the issue of whether plaintiffs' claim was barred by the statute of limitations. (Appeal No. 88-1834) Because we find that summary judgment was proper on the issue of causation, it is unnecessary for us to consider the statute of limitations issue
 
 
 [2]
 Plaintiffs' Statement of Issues lists as one issue on appeal whether the district court erred in granting summary judgment to all defendants because it found that all defendants were "similarly situated." However, plaintiffs fail to argue clearly that issue in the body of their brief. Their failure to do so can be construed as a waiver. See In re Texas Mortgage Services Corp., 761 F.2d 1068, 1073 (5th Cir.1985)
 Moreover, a court can grant summary judgment to a nonmoving party so long as the losing party had adequate opportunity to show whether there exists a genuine issue of fact or whether its opponent is entitled to judgment as a matter of law. See In re Caravan Refrigerated Cargo, Inc., 864 F.2d 388, 393 (5th Cir.1989); Pueblo of Santa Ana v. Mountain States Tel. & Tel. Co., 734 F.2d 1402, 1408 (10th Cir.1984), rev'd on other grounds, 472 U.S. 237 (1985); Wright, Miller & Kane, Federal Practice & Procedure p 2720 (2d ed. 1983). There is no evidence of prejudice in this case because the plaintiffs had ample opportunity to address the issue of causation in response to Texaco's and Pennzoil's motion for summary judgment. There is no suggestion in the record or in the briefs that plaintiffs would have responded differently to the motion for summary judgment had plaintiffs known that all of the defendants were seeking summary judgment on the issue of causation.
 
 
 [3]
 For example, Dr. Teitelbaum's testified as follows:
 Q. "Based upon this history, I believe that it may be possible to associate Mr. Sweger's kidney cancer with exposure to hydrocarbons including gasoline over a prolonged period of time." Explain that.
 A. I think I have over this time. I view this as a transitional cell cancer, as it's described, not as a kidney parenchymal cancer. There is a considerable literature demonstrating that those cancers, the transitional cell cancers, are associated with organic amines, and that smoking, for instance, is associated with it. This is a tumor which has a very high likelihood of environmental cause.
 I believe that, as I've indicated to you, there are many hydrocarbons to which Mr. Sweger was exposed and that those together would have to be looked at as contributing causes to his disease.
 R.Doc. 140, Ex. A at 70-71.
 Q. I didn't state that properly. Will you tell me what your opinion is of all the causative factors of the transitional cell cancer that was discovered in 1971 in Mr. Sweger.
 A. Okay, I think I tried this morning to make that clear. I believe that the transitional cell cancer which developed in Mr. Sweger was the result of a whole series of processes, including his carbon tetrachloride exposure, his exposure to various solvents, his exposure to motor oils, new and used, and their additives, his exposure to gasoline, and his genetic makeup, propensity to develop cancer.
 Q. Smoking?
 A. Yeah, I included smoking, I think. If I didn't, I certainly intended to. That those factors coming together resulted in his disease. My reading of his exposure says that the--the extraordinary exposure for him, which differentiates him from the rest of the population, is his occupational exposure, and I've outlined those in some detail in the morning portion of this discussion.
 R.Doc. 140, Ex. A at 120-21.
 
 
 [4]
 In addition, Dr. Teitelbaum testified as follows:
 Q. Do you have an opinion as to how much exposure to whatever the causal factors involved here are before you have had it sufficient to cause cancer?
 A. No.
 R.Doc. 140, Ex. A at 125.
 Q. And are you in a position, particularly with respect to Mr. Sweger's history, to opine for us as a matter of reasonable scientific certainty whether in his case it was a single incidence of initiation and subsequent promotion or multiple incidences?
 A. I have no opinion about that.
 Q. Is there any way to a degree of reasonable scientific certainty you could develop an opinion? Is there anything you could do to kind of sort that out and figure that out?
 A. I have no of no way to do that.
 R.Doc. 140, Ex. A at 210.
 
 
 [5]
 Dr. Teitelbaum testified as follows:
 Q. Is it possible that Mr. Sweger's exposure to motor oil was not a factor in the development of transitional cell cancer?
 A. It's possible.
 R.Doc. 140, Ex. A at 167-68.
 Q. Can you state in terms of reasonable medical certainty in this case whether Mr. Sweger would have developed transitional cell cancer, even in the absence of exposure to motor oil?
 A. I think it's unlikely that he would have developed it, although it is possible.
 R.Doc. 140, Ex. A at 187; R.Doc. 140, Ex. A at 188 ("it is possible he would have had this cancer without his exposure").
 
 
 [6]
 For example, Dr. Teitelbaum testified as follows:
 I see a lot of exposure, hand exposure, contact over many years, continuing really up to the time that I saw him, with oils and oil products--of all sorts. Ranging from air conditioning oils to cylinder oils, and so on. I see a mixed solvent exposure, carburetor cleaners, paints; I think those are contributing causes.
 And that's as I see the things that when I come to a summary, I would say that this is a man who had an extraordinary exposure over his working career to carcinogens.
 R.Doc. 140, Ex. A at 64-65.
 Q. Then, what is it that enables you, with your training and skill, to look at the records from 1971, and without having had the opportunity to examine Mr. Sweger at the time that he had this cancer, to arrive at an opinion as to the cause of that cancer?
 A. I think it's very, very straightforward. It's a question of quantity of exposure. If you spent the rest of your life breathing in wood smoke from creosote-treated wood and you inhaled a lot of polynuclear aromatic hydrocarbons, you had never been a smoker, and you developed a lung cancer, it would be almost impossible to say that the polynuclear aromatic in that wood smoke was not either the sole cause or the most probable cause or a major contributing cause to that cancer.
 As I see Mr. Sweger's history, the thing which distinguishes him from most other people is his extraordinary exposure over a long working period to materials which contained, among other things, polynuclear aromatics.
 That's not the only thing they contained, but that's one of the significant things that they contained. And that is unusual. Most people do not spend their lives with their hands in polynuclear aromatic-containing motor oils for 20 years.
 R.Doc. 140, Ex. A at 91-92.
 
 
 [7]
 Q. Okay. Now, in Mr. Sweger's case, do you have an opinion, sir, as to what the initiator was?
 A. No.
 Q. Do you have an opinion as to what the promoter was?
 A. Some components of one of the material which we've discussed today.
 Q. Okay. And by some component of one of the materials, you mean some component of the used motor oils?
 A. No, and/or one of the other substances I've discussed. The carbon tetrachloride, and so on. I can't give you a specific answer to that.
 Q. All right. And as I understand what you've told us here today, you don't know when that promoter struck the initiated cell and precipitated Mr. Sweger's cancer?
 A. That's correct.
 R.Doc. 140, Ex. A at 206-207.
 
 
 [8]
 The Court of Appeals of Oklahoma in Canadian Public School Dist. No. 2 v. McGraw-Edison Mfg., 634 P.2d 782 (Okla.App.1981), citing Kirkland, stated that a products liability plaintiff had to prove that the "defectiveness caused or contributed to the cause of harm to plaintiff." Id. at 785 (emphasis added). In Canadian Public School, gas leakage from a room heater manufactured by defendant combined with other factors to cause the fire which destroyed the plaintiff-school. Although the court recognized that the room heater was not the sole cause, it found that it was "an essential causational link in the chain of events culminating in the [injury]." Id. at 786
 
 
 [9]
 The district court's determination that the depositions were necessary expenses is "an issue of fact to be determined by the district judge based on ... the existing record." Touche Ross, 854 F.2d at 1245. Plaintiffs have failed to argue on appeal that the depositions were not necessary expenses and therefore we do not consider this issue
 
 
 [10]
 Plaintiffs also note that they brought the suit in good faith. However, good faith alone does not immunize the losing party from paying costs. See Muslin v. Frelinghuysen Livestock Managers, 777 F.2d 1230, 1236 (7th Cir.1985)