NOTICE

Decision filed 04/23/19. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2019 IL App (5th) 170446

NO. 5-17-0446

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| ANITA IRVIN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 15-L-74 |
| | ) | |
| SOUTHERN ILLINOIS HEALTHCARE, | ) | |
| d/b/a Carbondale Memorial Hospital; | ) | |
| THE CITY OF CARBONDALE; THE CITY OF | ) | |
| CARBONDALE POLICE DEPARTMENT; and | ) | |
| OFFICER MARK MURRAY, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (Southern Illinois Healthcare, d/b/a Carbondale | ) | Christy W. Solverson, |
| Memorial Hospital, Defendant-Appellee). | ) | Judge, presiding. |

_____

JUSTICE CHAPMAN delivered the judgment of the court, with opinion.
Justices Welch and Cates concurred in the judgment and opinion.

**OPINION**

¶ 1     At issue in this appeal is what steps a health care provider may take if it has reason to believe that a patient may be suicidal. The plaintiff, Anita Irvin, sought treatment for swelling and pain in her leg at the emergency room of a hospital operated by the defendant, Southern Illinois Healthcare. At some point, her primary care physician informed the attending emergency room physician that the plaintiff recently made suicidal ideations. Emergency room personnel prevented the plaintiff from leaving the hospital. When and if the plaintiff was asked to speak to a mental health counselor is in dispute. Emergency room personnel also required the plaintiff to

1

change into a paper hospital gown, turn over her purse, and provide blood and urine samples before a counselor could be called to evaluate her. The plaintiff subsequently filed a complaint for false imprisonment. The court granted summary judgment in favor of the defendant. The plaintiff appeals, arguing that summary judgment was inappropriate because there were genuine issues of material fact concerning the lawfulness of her detention. We hold that a health care provider must comply with the requirements of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/1-100 *et seq.* (West 2014)). Because we agree with the plaintiff that there are genuine issues of material fact related to whether the defendant did so, we reverse.

¶ 2                                                    I. BACKGROUND

¶ 3     The events at issue took place in August of 2014. At the time, the plaintiff's primary care doctor was Dr. Jeffrey Parks. Among other things, he was treating her for pain and swelling in her right leg, which had been an ongoing problem for seven years. The plaintiff saw Dr. Parks for this problem on August 12. According to one of Dr. Parks' nurses, Leah Hutton, as the plaintiff was leaving the office, she said that she was so tired of dealing with the pain and swelling in her leg that she "felt like slitting her wrists." Hutton left a message for Dr. Parks, informing him of the plaintiff's comment. According to Dr. Parks, he saw Hutton's message the following morning. He followed up with the plaintiff by urging her to seek counseling, which she refused to do. He also discussed the matter with the plaintiff's husband, who assured him that his wife was not suicidal. Dr. Parks did not take any of the steps available under the Mental Health Code to have the plaintiff involuntarily committed or detained for a mental health evaluation. See *id.* §§ 3-601, 3-602, 3-603, 3-605.

¶ 4     Two days later, on August 15, 2014, the plaintiff called Dr. Parks's office, again complaining of pain and swelling in her leg. He suggested that she go to the emergency room at

2

Carbondale Memorial Hospital, which is operated by the defendant. He also told her that he would schedule an MRI. Dr. Parks did not intend to schedule the MRI that day, during the plaintiff's emergency room visit; however, that is what she believed he meant. Dr. Parks told the plaintiff to ask for Dr. Haake.

¶ 5 The plaintiff drove herself to the emergency room at Carbondale Memorial Hospital. Her husband, Ted Irvin, met her there. Although the precise sequence of events is in dispute, the following facts are not. The plaintiff arrived at the emergency room sometime between 2 and 3 p.m. She indicated that her chief complaint was pain and swelling in her leg. She asked for Dr. Haake, but she was seen by Dr. John Bollig. Ted Irvin left to go to work sometime between 5 and 6 p.m. There is no indication in the record that Dr. Bollig or any of the nurses treating the plaintiff were aware of the plaintiff's earlier statement to Dr. Parks prior to Ted's departure, and there is no indication that the plaintiff engaged in any behavior that led them to believe that a mental health evaluation was necessary.

¶ 6 The plaintiff walked out of the hospital sometime between 7 and 7:20 p.m. She was not given discharge papers. She was approached in the parking lot by a nurse, who told her she could not leave. When the plaintiff refused to accompany the nurse back into the hospital, the nurse called security. At some point, the police were also called. The plaintiff walked back into the hospital with the two security guards and the nurse at about the same time the police arrived.

¶ 7 The plaintiff was then detained in an exam room by two security guards, a nurse, and three police officers. According to the defendant, the plaintiff was told that she was being detained for a mental health evaluation before she walked out of the hospital. According to the plaintiff, she was never told why she was not allowed to leave.

¶ 8 It is undisputed that while the plaintiff was detained in the exam room, she was required to get undressed, put on a paper hospital gown, provide blood and urine samples, and turn over

3

her purse to the security guards before emergency room personnel would even request that a mental health counselor come to the room to evaluate her. The plaintiff refused to do so. She sat on her purse so it could not be taken from her. This led to a struggle for possession of the purse involving the plaintiff, one of the police officers, and one of the security guards. Although the plaintiff denies biting the police officer during this struggle, she was subsequently convicted on one count of battery for doing so. The officer managed to take the plaintiff's purse from her. The plaintiff was then shackled to the bed until she was transported to jail on the battery charge. We note that although she had to be medically cleared before she could be taken to jail, once she was shackled to the bed, no further medical or psychiatric evaluation took place.

¶ 9    On August 14, 2015, the plaintiff filed a four-count complaint against the City of Carbondale, the Carbondale Police Department, the defendant, and Officer Mark Murray. She alleged that she was forcibly detained by the defendant's security guards without lawful justification. She further alleged that Officer Murray removed her purse at the direction of hospital staff. She alleged that, in doing so, Officer Murray forced her head between her knees, which exacerbated neck pain she was experiencing due to a recent surgery. (We note that, at the plaintiff's bench trial on the battery charge, security guard Albert Keown denied that anyone pushed the plaintiff's head down during the struggle over her purse, but Officer Murray testified that he believed one of the security guards did so. The plaintiff testified that one of the officers pushed her head down.) The plaintiff further alleged that she experienced significant emotional distress as a result of the incident. She asserted claims of aggravated battery and intentional infliction of emotional distress against all four defendants, a claim of false imprisonment against Southern Illinois Healthcare, and a claim of false arrest or false imprisonment against the other three defendants. The court granted motions to dismiss three of the four claims. The only claim remaining is the false imprisonment claim against the defendant, Southern Illinois Healthcare.

4

¶ 10    On June 14, 2017, the defendant filed a motion for summary judgment on the remaining claim. It argued that the plaintiff could not prove that her detention was unlawful or unreasonable, one of the elements necessary to support a claim of false imprisonment. The defendant asserted that hospital staff had knowledge of statements of "suicidal ideation and self mutilation" made by the plaintiff. It argued that her "brief detention" was therefore "reasonable to allow a mental health counselor to perform an evaluation to determine whether the plaintiff was subject to involuntary commitment or could be released for follow-up outpatient care and treatment." Attached to the motion were the discovery depositions of the plaintiff and Dr. Parks, a transcript of the plaintiff's bench trial on the battery charge, and a patient information record from her emergency room visit.

¶ 11    In his deposition, Dr. Parks testified that he was the plaintiff's primary care doctor from 1999 until 2014, when the incident at issue took place. He testified that the plaintiff's health problems included high blood pressure and back pain, in addition to the pain and swelling in her right leg. He explained that the pain and swelling in the plaintiff's leg began in 2007, after she fell while skating. The fall left her with a sore above her knee that did not heal properly and chronic pain in the leg. He also testified that at some point, the plaintiff was prescribed an antidepressant, although he did not know whether she was taking it in the summer of 2014.

¶ 12    Dr. Parks relied on a section of the plaintiff's medical records called "Nurses' Notes" for most of his testimony concerning the events at issue. He explained that the Nurses' Notes section was used to document phone calls and that it could be used by any of the medical providers in his office, not just the nurses. He testified that he saw the plaintiff in his office for leg pain on August 12, 2014, three days before the incident at the defendant's emergency room. He then testified about the Nurses' Notes entries for the following day, August 13. He noted that he received a message from a nurse, Leah Hutton, that when the plaintiff was leaving after her

5

appointment the previous day, she told Hutton that "she was about ready to give up, that she felt like slitting her wrists." Dr. Parks responded by leaving a message with another nurse, Katherine Lively. He told Lively to call the plaintiff to "check on her" and to "offer intervention if she is suicidal."

¶ 13    Dr. Parks next testified as follows:

"I have another entry from August the 13, 2014, from Katherine Lively. She says, 'Patient stated that she is serious as far as her threats and she is just tired of living this way. Encouraged the patient to go to the local ER for evaluation, and the patient is refusing. Also stated that she had read online about how she can cut herself to release fluid and is thinking that she may do that this weekend because she has no other option.' "

Dr. Parks testified that he made another entry indicating that he called both the plaintiff and her husband. He, too, urged the plaintiff to go to the emergency room, but she refused.

¶ 14    Dr. Parks described one more Nurses' Notes entry from August 13, 2014. The entry indicated that at 2:16 p.m., the plaintiff's husband came to the office to pick up some paperwork for the plaintiff. He informed Dr. Parks that he had checked on his wife. She was irritable but did not intend to harm herself.

¶ 15    As stated previously, the plaintiff was detained by personnel at the defendant's emergency room two days later, on August 15, 2014. Dr. Parks again relied on the Nurses' Notes section to testify about the events of that day. An entry at 11:29 a.m. indicated that Dr. Parks received a call from Ted Irvin, informing him that the plaintiff wanted him to order a device she had seen online that could "suck the fluid out of her leg." Dr. Parks "strongly advised against that" and "warned of the possibility of infection and failure." He suggested that the plaintiff

6

instead go to the emergency room. He also suggested that the plaintiff undergo an MRI of her leg "to check for areas of infection or fluid that could be aspirated by the interventional radiologist."

¶ 16 A second entry, at 1:37 p.m., indicates that the plaintiff called Dr. Parks and told him that she would go to the emergency room as he suggested. Dr. Parks noted, "I called to report to Dr. Haake. I also advised [the plaintiff] to have an MRI of the right upper and lower leg, the right knee. I will ask the nurse to schedule this."

¶ 17 Dr. Parks then described a third Nurses' Notes entry from 8:36 p.m. on August 15, 2014. That entry documented his telephone conversations with the plaintiff and emergency room doctor John Bollig. It indicated that the plaintiff called Dr. Parks at 5 p.m. and told him that she was frustrated because the emergency room doctor was not helping her. She asked Dr. Parks to call the emergency room doctor. Dr. Parks testified that he called Dr. Bollig and gave him a history of the pain and swelling in the plaintiff's leg as well as "her suicidal ideation." Dr. Parks stated that the plaintiff called him again between 7 and 7:30 p.m., asking him to tell the emergency room doctor to release her. When he told her he could not do so, the plaintiff hung up. Dr. Parks then called Dr. Bollig, who told him that "he had confronted [the plaintiff] about her suicidal ideation and she would not confirm that she did not intend to hurt herself."

¶ 18 On cross-examination, Dr. Parks acknowledged that on August 13 and 14, he did not believe that the plaintiff's mental state was serious enough that he needed to call the police or anyone else to intervene. He did not recall whether he told Dr. Bollig that the plaintiff's husband had assured him on August 13 that his wife was not suicidal. We note that Dr. Parks was not asked what, if anything, he said to Dr. Haake. Dr. Parks was also not asked whether he told Dr. Bollig that he learned of the plaintiff's comment two days earlier and did not believe it was necessary to take any steps to intervene on an emergency basis during those two days.

7

¶ 19    In her deposition, the plaintiff testified that on the afternoon of August 15, 2014, Dr. Parks called her at work about her leg. He directed her to go to the emergency room and ask to see Dr. Haake, and he told her that he wanted her to have an MRI of her leg. The plaintiff understood this to mean that the MRI would be performed that day at the hospital. She did not know why Dr. Parks sent her to the emergency room rather than the imaging department, but she thought that it might have been because the imaging department would be closed by the time she arrived. The plaintiff testified that she also thought that she would be given antibiotics intravenously, but she did not explain the basis for this assumption.

¶ 20    The plaintiff testified that when she arrived at the defendant's emergency room, she registered, went to an exam room, and put on a hospital gown. A nurse came into the exam room and took the plaintiff's vital signs. Dr. Bollig then came in and examined the plaintiff's leg. The plaintiff testified that she told Dr. Bollig that Dr. Parks had instructed her to ask for Dr. Haake "because they were probably going to do an MRI." According to the plaintiff, Dr. Bollig laughed at this. He told her that he had not spoken with Dr. Parks and that there was nothing he could do for her leg.

¶ 21    The plaintiff testified that Dr. Bollig left the exam room, but later came back. At this point, the plaintiff explained, she told Dr. Bollig that she knew that the fluid in her leg needed to be drained because she had "been through this before." According to the plaintiff, she told him that during a previous hospital visit, something called a "JP drain" was put in her leg. She also told him that that she was sent home with the device. The plaintiff then stated, "And he took that to mean that I was going to put a drain in myself. Well, no, of course not."

¶ 22    According to the plaintiff, Dr. Bollig again told her that there was nothing that could be done for her leg in the emergency department. He told her to follow up with her family doctor, and he left the exam room. The plaintiff testified that no one came into the room to tell her she

could leave. Eventually, a nurse came in. The plaintiff asked if she could get dressed. The nurse, who was not the same nurse who attended to the plaintiff earlier, told the plaintiff that she believed so. The plaintiff got dressed and went to the registration area. She testified that when she asked if there was anything else she needed to sign, she was told that there was not. The plaintiff then left the hospital. She acknowledged that she was never given discharge papers.

¶ 23    The plaintiff testified that when she walked out of the hospital, she had been in the emergency room for four hours. She stated that during those four hours, none of the hospital staff indicated to her that there was any concern about her mental health.

¶ 24    The plaintiff further testified that immediately after she walked out, a nurse came "chasing" after her in the parking lot to tell her that she could not leave the hospital. The plaintiff told the nurse that she wanted to get home so she could get off her leg, which was hurting badly by this point. She also needed to get home to take care of a sick pet. She told the nurse that she was going home and continued to walk towards her car. The plaintiff testified that the nurse then called security. According to the plaintiff, neither the nurse nor the security guard would tell her why she was not allowed to leave. She admitted that she was likely rude to the security guard who confronted her in the parking lot, but she denied cursing at him. She explained that she was very upset at this point.

¶ 25    The plaintiff testified that she was escorted back to an exam room in the emergency department. A nurse, two security guards, and three police officers stayed in the room with her. She testified that they "were making fun of her." She further testified that she was told that she had to change back into a paper hospital gown, give the security guard her purse, and speak with a doctor. According to the plaintiff, however, no one would tell her why she had to speak with a doctor, and no doctor ever showed up.

9

¶ 26    The plaintiff's testimony at her trial for battery was consistent with her deposition testimony, but she provided a few additional details. She testified that she arrived at the emergency room "a little before 3:00" in the afternoon, and that her husband later met her there. She noted that she put on a hospital gown when she went into the exam room, but was allowed to keep her purse with her. She testified that she was at the emergency room for four hours. She did not make any comments about suicide to any of the hospital personnel who she saw during this time.

¶ 27    The plaintiff further testified that when hospital staff prevented her from leaving, she asked why she was being detained, but no one would tell her. She noted that her husband had gone back to work by this time. The plaintiff admitted that she "was getting pretty agitated." She also acknowledged that she attempted to hold onto her purse when the security guard and police officer attempted to take it from her. The plaintiff denied biting the police officer during that struggle. She emphasized that she did not see a doctor or receive any further medical care after she was prevented from leaving the hospital.

¶ 28    Ted Irvin testified at the plaintiff's battery trial that the plaintiff called to tell him that she was on her way to Carbondale Memorial Hospital with leg pain. He drove to the hospital to meet her there. He testified that he met the plaintiff in the emergency department waiting room and then went into the exam room with her. Irvin stated that he did not hear the plaintiff say anything to any hospital personnel about wanting to kill herself. He acknowledged, however, that he left to go to work while the plaintiff was still there. He estimated that he left at 5 or 5:30 p.m. He explained that he worked evenings as a medical courier. Irvin testified that the plaintiff was in pain but was fine emotionally.

¶ 29    One of the two security guards involved in detaining the plaintiff and one of the three Carbondale police officers who responded also testified at the plaintiff's battery trial. Albert

Keown, the security guard, testified that he and another security guard responded to a request for assistance with a potentially suicidal patient attempting to leave the hospital. Keown approached the plaintiff in the hospital parking lot and asked her to return to the building. After she refused, he called the Carbondale Police Department to request assistance. According to Keown, he believed that the plaintiff might be a danger to herself or others based on "the way she was acting." Asked to explain, he stated that her behavior was "aggressive." However, he specified only that she cursed at him and refused to go back into the building voluntarily. Keown further testified that the plaintiff did eventually walk back into the building of her own accord once she saw the police arrive.

¶ 30    Keown testified that after the plaintiff returned to the hospital building, she was brought to an exam room. A nurse, an emergency room technician, two security guards, and at least one police officer were in the room with her. Keown acknowledged that, at this point, the plaintiff was not free to leave. He further acknowledged that he stood in the doorway of the room to prevent her from leaving.

¶ 31    Keown explained that the defendant's policy of detaining patients believed to be potentially suicidal exists to avoid liability in case the patient harms himself or herself after leaving the hospital. He testified that the defendant's policy is to "place [the patient] in a paper gown and [to] take their belongings and put them in a belongings bag." He explained that the patients' belongings are taken to guard against the possibility that the patient has medication or anything else she could use to harm herself. He did not give any reason for the policy of insisting that the patient change into a paper hospital gown.

¶ 32    Keown testified that the plaintiff continued to state that she wanted to leave and refused to change into a hospital gown or hand over her purse. After attempting to convince her to give up her purse voluntarily, a nurse asked the security guards to take it from her by force. Keown

11

testified that the plaintiff bit a police officer's hand during the ensuing struggle for possession of her purse.

¶ 33    On cross-examination, Keown was asked, "Did you have a [section] 602 certificate advising you that Ms. Irvin was to be secured and kept until she could be evaluated by a doctor?" See 405 ILCS 5/3-602 (West 2014). Keown replied, "It was verbal." He testified that, contrary to the plaintiff's claim, he did tell her why she was required to stay. He did not state whether he or any other staff members asked her if she would be willing to talk to a mental health counselor.

¶ 34    Officer Mark Murray testified that he first encountered the plaintiff when she was in an exam room. He stated that hospital staff told her to relinquish her purse, put on a hospital gown, and provide blood and urine samples, which she refused to do. He, too, was asked on cross-examination about the existence of section 602 certificates. He replied, "The nurse that I spoke to said she was not free to leave."

¶ 35    Officer Murray's testimony concerning the struggle over possession of the plaintiff's purse was largely consistent with the testimony of both Keown and the plaintiff. As stated previously, however, Officer Murray indicated that he thought one of the security guards pushed the plaintiff's head down, which Keown denied. Officer Murray also testified that the plaintiff bit him during this struggle, which the plaintiff denied. After that, both her hands and feet were "secured" to the bed. Officer Murray testified that he remained with the plaintiff until she was discharged approximately 15 to 20 minutes after the incident, and he then transported her to the jail. Officer Murray did not recall whether any doctor saw her during that time period.

¶ 36    Also attached to the defendant's motion for summary judgment was a patient information record from the plaintiff's emergency room visit. The record indicates that the plaintiff arrived at the emergency room at 2:11 p.m., was seen by a triage nurse at 2:45 p.m., and admitted at 3:01

12

p.m. She was first taken to an exam room at 3:52 p.m. The record shows that the plaintiff's chief complaint upon admission was pain in her leg.

¶ 37    Notes from Dr. John Bollig indicate that he first saw the plaintiff at 5:28 in the evening. She described to him the symptoms of pain and swelling she was experiencing and provided a medical history. Under the heading "Re-Evaluation & MDM," Dr. Bollig noted that Dr. Parks called him to inform him that the plaintiff "has been making suicidal statements over the last week," which was "the big reason he told her to come to the [emergency department]." Dr. Bollig further wrote:

> "When I confronted the patient with this she was very coy but stated that if she had to live with her chronic leg problems she would do what ever needed to be done to put it to an end ***. She would cut her leg and let it all drain out or whatever. I informed her that if we were able to medically clear her, we would need to have mental health come in and talk with her to decide psychiatric disposition. She shortly after ran out of the [emergency department]."

Dr. Bollig did not indicate what time either his discussion with Dr. Parks or his reevaluation of the plaintiff took place.

¶ 38    Three additional portions of the patient information record are relevant. A 7:29 p.m. note entered by nurse Chelsey Stacy states, "Patient walked out of ER room 2, stating, 'I'm not going to have a counselor speak to me!' Went to ERBO asking for discharge papers. Security called." A 7:30 note entered by nurse Janet Donahue indicates that the plaintiff was escorted to a different exam room by two security guards and three police officers. Donahue noted that when the plaintiff entered the room, she "very loudly stated, 'I am not staying here. I have a sick animal at home. Just let me talk to the counselor, just get them here.' " Donahue noted that another nurse explained to the plaintiff that because she was there for suicidal ideations, hospital

13

policy required her to get into a hospital gown and surrender her belongings. The nurse also explained that they could request that a counselor come to the room to talk to her after she got into the hospital gown and provided a urine sample, so hospital personnel could complete "required lab work." As we mentioned earlier, hospital policy also required a patient in the plaintiff's position to submit to blood testing prior to speaking with a counselor. The patient information record indicates that the plaintiff's blood was drawn at 6:43 p.m., presumably for this purpose. Although there is some dispute in the record concerning the precise timing of this sequence of events, the blood draw appears to have occurred before the plaintiff attempted to leave the hospital.

¶ 39    The plaintiff did not file a response to the defendant's motion for summary judgment. The matter came for a hearing on October 17, 2017. The court noted in a docket entry that it heard arguments on the defendant's motion for summary judgment, but the record does not contain a transcript of that hearing. On October 19, the court entered an order granting the defendant's motion for summary judgment. This appeal followed.

¶ 40                                II. ANALYSIS

¶ 41    False imprisonment has two elements. To prevail, a plaintiff must prove both that (1) her personal freedom was curtailed against her wishes and (2) her detention was unreasonable or unlawful. *Doe v. Channon*, 335 Ill. App. 3d 709, 713 (2002). The parties agree that the plaintiff was detained against her wishes by the defendant. As such, only the second element—the lawfulness of that detention—is at issue.

¶ 42    This case comes to us after a ruling on a motion for summary judgment. Summary judgment is not appropriate unless the pleadings, depositions, and other evidence on file show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Id.* Summary judgment is also not appropriate if it is possible to draw more

than one reasonable inference from even undisputed facts in the record. *Buchaklian v. Lake County Family Young Men's Christian Ass'n*, 314 Ill. App. 3d 195, 199 (2000). In determining whether genuine issues of material fact exist, courts must consider the record in the light most favorable to the nonmoving party. *United National Insurance Co. v. Faure Brothers Corp.*, 409 Ill. App. 3d 711, 716 (2011). As the defendant emphasizes, questions of fact that are not material will not preclude summary judgment. A question of fact is material if it is relevant to one of the controlling issues in the case. *First of America Bank, Rockford, N.A. v. Netsch*, 166 Ill. 2d 165, 178 (1995). Summary judgment should not be granted unless the moving party's right to judgment is "clear and free from doubt." (Internal quotation marks omitted.) *United National Insurance Co.*, 409 Ill. App. 3d at 716. We review *de novo* the court's ruling on a motion for summary judgment. *Id.*

¶ 43 The plaintiff argues that summary judgment was inappropriate because there were genuine questions of material fact concerning the reasonableness of the defendant's decision to detain her. Resolving this question requires us to consider when it is lawful to detain an individual for a mental health evaluation. This is because detention of an individual pursuant to lawful authority cannot constitute false imprisonment. *Doe*, 335 Ill. App. 3d at 713. To answer that question, we must look to the Mental Health Code.

¶ 44 We first note that, as a general matter, a patient has the right "to refuse generally accepted mental health *** services." 405 ILCS 5/2-107(a) (West 2014). Services can be administered on an outpatient basis by court order under certain circumstances. See *id.* § 1-119.1. Otherwise, treatment may not be performed against a patient's wishes unless it is "necessary to prevent the [patient] from causing serious and *imminent* physical harm" to herself or others. (Emphasis added.) *Id.* § 2-107(a). A patient likewise has the right to refuse to submit to an examination to determine whether she is subject to involuntary admission. *Id.* § 3-208. Indeed, the evaluator

15

conducting the examination is required to inform the patient that she does not have to speak with the evaluator. *Id.*

¶ 45　The Mental Health Code does, however, include procedures to follow to obtain the evaluation of an unwilling patient who may be subject to involuntary admission on an emergency basis. A patient is subject to involuntary admission on an emergency basis if immediate admission is necessary to protect the patient or others from imminent physical harm. *Id.* § 3-601(a). To have a patient admitted, an adult must present a petition to the director of a mental health facility. *Id.* The petition must include a "detailed statement" setting forth the reasons the patient is subject to immediate involuntary admission. *Id.* § 3-601(b)(1).

¶ 46　A petition for emergency involuntary admission must be accompanied by the certificate of a physician, psychiatrist, or other qualified examiner who examined the patient within the previous 72 hours. *Id.* § 3-602. As noted earlier, however, a patient is generally not required to submit to an examination for this certificate. See *id.* § 3-208. If the patient refuses to be evaluated, she "may be detained for examination in a mental health facility." *Id.* § 3-603(a). We note that the statutory definition of a mental health facility includes any section of a licensed hospital that provides treatment for people with mental illnesses. *Id.* § 1-114. To have a patient detained for examination, the petition required by section 3-601 must be presented to the director of the facility. In addition to complying with the requirements of section 3-601, the petitioner must assert that a diligent effort was made to obtain a certificate and that a diligent effort was made to persuade the patient to submit to a mental health evaluation willingly. *Id.* § 3-603(b)(2), (4).[1] If a patient is detained for examination without a certificate, she may not be held for more

---

[1]The pertinent statute requires the petitioner to specify that (1) he believes, based on personal observation, that the patient is subject to involuntary admission, (2) a diligent effort was made to obtain a certificate, (3) no qualified examiner was found who has examined the patient or could do so, and (4) a

16

than 24 hours unless a certificate is furnished within that time period. *Id.* § 3-604. For reasons we will discuss in more detail later in this opinion, we find that there are genuine issues of material fact concerning the defendant's compliance with these requirements.

¶ 47    The defendant, however, argues that whether its decision to detain the plaintiff against her wishes was lawful depended solely on whether it had probable cause to believe that she may be suicidal. We disagree. Although the defendant cites numerous cases holding a detention lawful based on probable cause, each of these cases arose after a police officer or security guard detained someone believed to have committed a crime. See, *e.g.*, *Poris v. Lake Holiday Property Owners Ass'n*, 2013 IL 113907, ¶¶ 61, 65; *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 474 (1990); *Grainger v. Harrah's Casino*, 2014 IL App (3d) 130029, ¶ 38; *Gill v. Village of Melrose Park*, 35 F. Supp. 3d 956, 963 (N.D. Ill. 2014). In such cases, it makes sense to hold that a plaintiff's detention is reasonable if it is supported by probable cause because, in the criminal context, probable cause is what makes the detention of an individual lawful. As we explained earlier, if the detention of an individual is lawful, it cannot constitute false imprisonment. See *Doe*, 335 Ill. App. 3d at 713.

¶ 48    In the mental health context, unlike the criminal context, what makes the detention of an individual lawful is compliance with the provisions of the Mental Health Code. See *id.* at 713-14 (affirming summary judgment in favor of the defendants in an action for false imprisonment upon finding that a plaintiff's overnight period of involuntary admission was lawful because the defendants complied with the applicable provisions of the Mental Health Code); *Sassali v. DeFauw*, 297 Ill. App. 3d 50, 52 (1998) (explaining that "a lawful detention pursuant to the provisions of the Mental Health Code cannot be the basis of a false imprisonment claim");

---

diligent effort was made to persuade the patient to submit to an evaluation voluntarily. 405 ILCS 5/3-603(b) (West 2014).

17

*Arthur v. Lutheran General Hospital, Inc.*, 295 Ill. App. 3d 818, 826-27 (1998) (explaining that the question in a false imprisonment case was whether the plaintiff's involuntary commitment was "detention under legal process," and finding that the "statutorily inadequate certificate and petition" in that case did not suffice to meet this standard). We recognize that all three of these cases involved plaintiffs who were involuntarily committed, while the plaintiff in this case was merely detained for an evaluation. At oral argument, the defendant made this distinction, arguing that the provisions of the Mental Health Code were inapplicable because the plaintiff was not involuntarily admitted. We are not persuaded. As we have already discussed, the Mental Health Code includes provisions that govern precisely the circumstances involved in this case—the procedures necessary to conduct an evaluation of an unwilling patient who may be subject to involuntary admission on an emergency basis. Detention of such a patient is not lawful unless these procedures are followed.

¶ 49　The defendant does call our attention to one case in which a court applied the probable cause standard in the mental health context. That case is *Chathas v. Smith*, 884 F.2d 980 (7th Cir. 1989). We find *Chathas* to be distinguishable.

¶ 50　One of the plaintiffs in *Chathas* was a police officer who filed a workers' compensation claim, asserting anxiety, neurosis, and depression as his work-related injuries. *Id.* at 981. At that time, litigation was pending related to the police department's failure to enroll him in the Illinois Municipal Retirement Fund. The pension litigation was set for a hearing on March 30, 1981. *Id.*

¶ 51　Shortly before that date, the officer, Ellis, was examined by a psychiatrist to verify his claim of mental disability. *Id.* The psychiatrist, Dr. Doshi, examined Ellis twice—once on March 19, and once on March 21. *Id.* at 981-82. During the March 19 examination, Ellis told Dr. Doshi that he believed that municipal officials and police officers were conspiring against him because of the pending pension litigation. *Id.* He told Dr. Doshi that he believed that those individuals

18

had threatened his life and the life of his attorney. He stated that if he felt " 'cornered,' " he might " 'blow somebody away.' " *Id.* at 982. Dr. Doshi was concerned that the March 30 hearing in the pension case could trigger Ellis's potential for violence. The March 21 examination did not alleviate this concern. Dr. Doshi urged Ellis to voluntarily admit himself to a mental health facility. When Ellis refused, Dr. Doshi explained that he was obligated to warn the potential victims of his threatened violence. *Id.*

¶ 52    Dr. Doshi called the police department later that day to relate his concerns. One week later—on March 28—a police sergeant asked Dr. Doshi to complete a certificate for the involuntary commitment of Ellis. Dr. Doshi did so. *Id.* at 983. Two days later, a hearing was set to take place in the pension litigation. On the morning of the hearing, an attorney representing the Village of Evergreen Park in the pension case arrived early and presented Dr. Doshi's certificate to the court. He asked the court to enter an order for involuntary commitment, which the court refused to do. *Id.*

¶ 53    When Ellis and his attorney, Chathas, arrived for the hearing in the pension case later that morning, a group of police officers stopped them from entering the court room and detained them in a jury room. *Id.* Ellis was prevented from leaving that room until paramedics arrived. *Id.* at 984. The paramedics transported Ellis to a mental health facility. Chathas voluntarily rode with him in the ambulance, and the officers who had detained them arrived separately. *Id.* The admissions specialist at the facility told the officers that the certificate signed by Dr. Doshi was not valid because Dr. Doshi had not examined Ellis within the previous 72 hours. He asked the officers if they personally witnessed any behavior that indicated to them that the plaintiff was a danger to himself or others. The officers indicated that they had not. *Id.* The admissions specialist therefore declined to admit Ellis to the facility or hold him for an evaluation. *Id.*

19

¶ 54    Ellis and Chathas subsequently filed a section 1983 petition in federal court, alleging that the police officers and other public officials involved in the incident violated their constitutional rights. *Id.* at 985 (citing 42 U.S.C. § 1983 (1988)). The district court directed a verdict in favor of all defendants. *Id.* In relevant part, the district court found that Ellis could not prove that his constitutional rights had been violated because the defendants had probable cause to take him into custody and transport him to the mental health facility for emergency observation, "or at the very least [they] had a good-faith belief that they had probable cause." *Id.* at 987. The plaintiffs appealed. *Id.* at 986.

¶ 55    The Seventh Circuit first noted that "[i]f the issue were whether [the] defendants complied with the governing state law, then we would have to reverse the district court's grant of a directed verdict. However, [section] 1983 only provides a remedy for federal law violations." *Id.* at 987. The court held that as long as the police officer defendants had probable cause to take Ellis into custody to transport him to the facility, as the district court found, their arrest of Ellis was legal even though he turned out not to be subject to commitment. *Id.* The court explained that although the defendants' failure to follow the applicable procedures in the Mental Health Code violated a "state-created procedural right," it did not necessarily violate a constitutional right. *Id.* The *Chathas* court thus made clear that the question before it was narrow because the cause of action was a section 1983 claim.

¶ 56    In this case, by contrast, the question is not whether the plaintiff's federal constitutional rights were violated. Rather, the question is whether the defendant is liable for committing a tort recognized under state law.[2] More specifically, the question is whether the defendant detained

---

[2]Failure to comply with the Mental Health Code does have constitutional implications. See *In re George O.*, 314 Ill. App. 3d 1044, 1046 (2000) (citing *In re Rovelstad*, 281 Ill. App. 3d 956, 964-65 (1996)). Those constitutional questions are not at issue in this tort action against a private defendant, however.

the plaintiff unlawfully. As we have already explained, the detention was lawful only if it complied with the requirements of the Mental Health Code. For the following reasons, we find that there are genuine issues of material fact on that question.

¶ 57    First, there are genuine questions of fact concerning whether the defendant's emergency room personnel made any efforts at all to persuade the plaintiff to submit to a mental health evaluation voluntarily before deciding to detain her. This fact is material because before a patient may be detained for an evaluation, the petitioner must be able to attest that a diligent effort was made to convince her to submit to the evaluation willingly. 405 ILCS 5/3-603(b)(4) (West 2014). The plaintiff testified in her deposition that she was not even told why she was being detained. This testimony was contradicted by the patient information record, but the defendant is not entitled to judgment as a matter of law where there is a dispute as to whether it complied with the requirement that a diligent effort be made to persuade the plaintiff to submit to an evaluation voluntarily. It is also worth noting that, although the defendant presented evidence that its employees told the plaintiff that she needed to be evaluated by a mental health counselor, there is no evidence that they ever asked her to do so voluntarily.

¶ 58    Second, it is not clear from the record that the defendant complied with the requirement of presenting a petition to the director of a mental health facility to have the plaintiff detained for examination. See *id.* §§ 3-601, 3-603. In fact, on the record before us, it appears that this requirement was not met. As mentioned earlier, the statutory definition of a mental health facility includes the section of a licensed hospital that provides mental health care. *Id.* § 1-114. The plaintiff was never transferred to the mental health unit of the defendant's hospital, and there is no indication in the record before us that any of its emergency department staff presented the required petition to the appropriate person in the mental health department. See *id.* § 1-104

21

(defining the "facility director"). Thus, the record presents genuine questions of fact on the material issue of the defendant's compliance with the requirement of a petition.

¶ 59     Third, there is some evidence in the record suggesting that the plaintiff may have reluctantly agreed to speak with a counselor as long as she could do so without additional delay. The parties appear to agree that the plaintiff's presence at the emergency room remained voluntary until she attempted to leave sometime between 7 and 7:20 p.m. The patient information record shows that her blood was drawn and a drug screening authorized *before* she attempted to leave, and the notes entered by one of the nurses indicate that the plaintiff asked the nurses to send for the counselor right away. While the Mental Health Code authorizes the detention of a patient in a mental health facility, it does not authorize the detention of a patient in an emergency room to comply with the hospital's internal policy of imposing prerequisites on a patient's access to the mental health services. Thus, if the plaintiff's presence in the emergency room became an unwilling detention only for the purpose of obtaining a urine sample and forcing her to change into a paper gown and surrender possession of her purse, it was not authorized by the Mental Health Code. Although the bulk of the evidence suggests that the plaintiff did not agree to remain at the hospital for an evaluation at all, we find that the existing record leaves genuine questions of fact on this point.

¶ 60     Fourth, the detention of a patient for a mental health evaluation is only authorized if the petitioner believes that the patient is or may be subject to involuntary admission and that immediate hospitalization is necessary to prevent harm to the patient or others. See *id.* §§ 3-600, 3-601, 3-603. If the defendant in this case were an individual who believed that the plaintiff presented an immediate risk of suicide or self-harm, this requirement would obviously be satisfied. As we discussed earlier, however, it is not clear from the record what information Dr. Parks gave to Dr. Bollig, the emergency room physician who made the decision to detain the

22

plaintiff. In addition, Dr. Parks appears to be affiliated with the defendant. He testified in his deposition that the defendant is the "parent company" of his practice, Logan Primary. Thus, there are questions as to whether Dr. Parks's knowledge of the plaintiff's mental state is chargeable to the defendant. This is significant because Dr. Parks admitted in his deposition that during the two days preceding the plaintiff's visit to the emergency room, he did not believe it was necessary to take steps to intervene other than encouraging her to seek counseling.

¶ 61 In the face of these disputed questions of material fact, we hold that the defendant was not entitled to judgment as a matter of law. As such, the trial court erred in granting summary judgment.

¶ 62 The defendant calls our attention to two additional cases that it contends support its right to summary judgment. We find no support for the defendant's position in either case.

¶ 63 The first of these cases is *Coleman v. Provena Hospitals*, 2018 IL App (2d) 170313. There, a nurse discovered that a patient with a history of mental illness had a gun in his possession. *Id.* ¶¶ 1, 3. The patient was shot to death during a confrontation with police officers after he pulled the gun. *Id.* ¶ 3. The decedent's sister filed a wrongful death action, asserting that the hospital was negligent for failing to search the decedent for weapons when he was admitted the day before the shooting. *Id.* ¶ 1. The plaintiff appealed an order granting summary judgment in favor of the hospital. *Id.* ¶¶ 11-12. One of the questions on appeal was whether the defendant hospital had a duty to protect the decedent from his own criminal act. *Id.* ¶ 14. The Second District first noted that Illinois courts have long recognized "that hospitals are under a duty to exercise reasonable care to protect their patrons from harm." *Id.* ¶ 17. The court then went on to address the defendant hospital's arguments related to the reasonable foreseeability of that harm before concluding that the defendant owed the decedent a duty to protect him from harming himself. *Id.* ¶¶ 18-19.

23

¶ 64   Here, the plaintiff has not alleged that the defendant breached a duty of care. Nevertheless, we agree with the defendant and the *Coleman* court that a hospital has a duty to take appropriate steps to prevent a patient from foreseeable harm, including self-harm. But this does not give its staff *carte blanche* authority to take steps that are not authorized under the Mental Health Code. As we have discussed at length in this opinion, the Mental Health Code provides procedures to be followed when a patient is thought to be at risk of imminent self-harm and is unwilling to voluntarily submit to an evaluation. The record in this case does not contain undisputed evidence establishing that those procedures were followed.

¶ 65   The defendant also calls our attention to the decision of a Missouri appellate court in *Patrich v. Menorah Medical Center*, 636 S.W.2d 134 (Mo. Ct. App. 1982). There, a patient was admitted to the defendant hospital's intensive care unit in a coma, having suffered what appeared to be a self-administered drug overdose. *Id.* at 135. When the plaintiff was conscious and able to talk, it became apparent to the physicians treating him that he was mentally ill. *Id.* In fact, he had been treated for mental illness at the same hospital on two prior occasions. *Id.* at 135-36. When the plaintiff was well enough to leave the intensive care unit, he was transferred to the hospital's mental health ward. *Id.* at 136. The day after he was transferred to the mental health ward, the superintendent of the defendant hospital and the plaintiff's treating physicians executed the appropriate documents to have the plaintiff admitted on an emergency basis. *Id.*

¶ 66   The plaintiff filed a complaint raising a claim of false imprisonment. *Id.* at 135. The question was whether his detention in the mental health ward the day before the defendant's medical personnel began the statutory process for emergency involuntary commitment was unlawful. *Id.* at 137. The trial court directed a verdict in favor of the defendant. *Id.* at 135. In affirming this ruling, the Missouri appellate court noted that "[a]t common law, a private person could, under some circumstances, legally restrain [a person] believed to be mentally ill." *Id.* at

24

138 (citing *Keleher v. Putnam*, 60 N.H. 30 (N.H. 1880)); see also *Warner v. State*, 79 N.E.2d 459, 463 (N.Y. 1948). The court noted, however, that such restraint is only authorized if " 'necessary to prevent some *immediate* injury by the [mentally ill person] to himself or others.' 44 C.J.S. Insane Persons, p. 161." (Emphasis added.) *Patrich*, 636 S.W.2d at 138. The court further noted that the Missouri Supreme Court recognized this common law principle of permissible restraint based on necessity. *Id.* (citing *In re Moynihan*, 62 S.W.2d 410, 418 (Mo. 1933)). The court ultimately concluded that the "detention of plaintiff for less than 24 hours" before the defendant filed the appropriate documents was lawful under this common law principle. *Id.* at 139.

¶ 67    We find no support in *Patrich* for the defendant's position for two reasons. First and foremost, an out-of-state case is not binding on this court. The defendant has not cited to any Illinois cases recognizing a common law principle authorizing the detention of a mentally ill individual based on necessity, and our research has uncovered no such cases.

¶ 68    Second, assuming Illinois courts were to recognize such a principle, it would not be applicable here. The provisions of the Mental Health Code we have outlined in this opinion were sufficient to permit emergency room personnel to transfer the plaintiff to the defendant's mental health department or some other facility for evaluation quite quickly. Thus, resort to restraint not authorized under the Mental Health Code cannot be justified by "necessity" under the circumstances of this case. See *Warner*, 79 N.E.2d at 463 (recognizing common-law authority to detain a mentally ill individual based on immediate necessity under New York law, but finding that such authority may be exercised only "in emergencies beyond" the type of emergency covered by the statutory provisions authorizing emergency commitment).

¶ 69    Nothing in either *Coleman* or *Patrich* alters our conclusion that there are genuine questions of material fact to be resolved concerning the lawfulness of the plaintiff's detention in this case. As such, summary judgment was inappropriate.

¶ 70                                III. CONCLUSION

¶ 71    For the foregoing reasons, we reverse the judgment of the trial court granting summary judgment in favor of the defendant. We remand for further proceedings consistent with this opinion.

¶ 72    Reversed and remanded for further proceedings.

2019 IL App (5th) 170446
NO. 5-17-0446
IN THE
APPELLATE COURT OF ILLINOIS
FIFTH DISTRICT

| | | |
|---|---|---|
| ANITA IRVIN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 15-L-74 |
| | ) | |
| SOUTHERN ILLINOIS HEALTHCARE, | ) | |
| d/b/a Carbondale Memorial Hospital; | ) | |
| THE CITY OF CARBONDALE; THE CITY OF | ) | |
| CARBONDALE POLICE DEPARTMENT; and | ) | |
| OFFICER MARK MURRAY, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (Southern Illinois Healthcare, d/b/a Carbondale | ) | Christy W. Solverson, |
| Memorial Hospital, Defendant-Appellee). | ) | Judge, presiding. |

_____

**Opinion Filed:**      April 23, 2019
_____

**Justices:**      Honorable Melissa A. Chapman, J.

Honorable Thomas M. Welch, J., and
Honorable Judy L. Cates, J.
Concur
_____

**Attorneys**
**for**
**Appellant**

Bryan A. Drew, Brittany L. Elliott, Drew Law Group, 905 W. Washington Street, Benton, IL 62812

_____

**Attorneys**
**for**
**Appellee**

John C. Ryan, Kara L. Jones, Feirich/Mager/Green/Ryan, 2001 West Main Street, P.O. Box 1570, Carbondale, IL 62903

_____